## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
### www.flmb.uscourts.gov

In re:                                              **Case No: 6:25-bk-03511-TPG**
                                                    **CHAPTER 11**
**KOLSTEIN MUSIC, INC.**

      **Debtor.**

_____ /

**KOLSTEIN MUSIC, INC.**

                                    **Adv. Pro. No.: _____**

      **Plaintiff,**

v.

**BARRIE KOLSTEIN**

      **Defendant.**

_____ /

### ADVERSARY COMPLAINT

Plaintiff, **KOLSTEIN MUSIC, INC.**, ("Plaintiff," the "KMI" or the "Debtor"), the debtor in the above-captioned bankruptcy case, by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 105, 542, 544, 548, 550 and Rule 7001, *Federal Rules of Bankruptcy Procedure*, hereby files this Adversary Complaint against **BARRIE KOLSTEIN,** an individual ("Kolstein" or "Defendant"). In support, Plaintiff alleges as follows:

### Parties, Jurisdiction, and Venue

1. This is an Adversary Proceeding within the meaning of Rule 7001 of the Federal Rules of Bankruptcy Procedure.

2. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E) and (H).

3.      On June 8, 2025 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

4.      Accordingly, this Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b) and 1334(e), and the standing order of the United States District Court for the Middle District of Florida referring all cases and proceedings under the Bankruptcy Code in this District to the Bankruptcy Court.

5.      Venue of the Debtor's Chapter 11 case and of this Adversary Proceeding is proper in this District pursuant to 28 U.S.C. §§ 1408-1409.

6.      Plaintiff is a Florida registered for-profit corporation which maintains its principal place of business at 3505 Lake Lynda Drive, Suite 200, Orlando, Florida 32817, and is the Debtor in the above-captioned bankruptcy case.

7.      Defendant is an individual who resides in Nassau County, New York and Sumter County, Florida and claims to be a creditor in the above-captioned bankruptcy case.

8.      Plaintiff consents to the entry of a final order or judgment by the Bankruptcy Court.

## **Material Factual Allegations**

9.      KMI has been in business since 1943 and was acquired by the Debtor's current President, Manny Alvarez (Mr. Alvarez) in 2019 (the "Acquisition") pursuant to that certain Stock Purchase Agreement dated August 7, 2019 a true and correct copy of which is attached hereto as **Exhibit "A"** (the "Stock Purchase Agreement").

10.       Pursuant to the Stock Purchase Agreement, Kolstein transferred 100% of his equity interests in KMI to Mr. Alvarez for the sum of $1,040,840.98 to be paid by Mr. Alvarez.

11.     KMI is identified and included in the Stock Purchase Agreement as a nominal party but otherwise owes no financial obligation to Kolstein under the terms of the Stock Purchase Agreement.

12.     In connection with the various transactions contemplated under the Stock Purchase Agreement – and as specifically required by the Stock Purchase Agreement – Kolstein was to execute and deliver his resignation of any position Kolstein held with KMI.

13.     Following his resignation, Kolstein retained no actual or apparent authority to act on behalf of KMI without specific authorization from Mr. Alvarez.

14.      In connection with his acquisition of KMI, Mr. Alvarez delivered two "Secured Promissory Notes" (the "Promissory Notes") true and correct copies of which are attached hereto as **<u>Composite Exhibit "B"</u>**.

15.     Pursuant to the Promissory Notes, Kolstein attempted to take a security interest in KMI's assets but failed to properly perfect such interest.

16.     KMI received nothing in exchange for a pledge of its assets as collateral for the Promissory Notes.

17.     Upon closing the various transactions contemplated by the Stock Purchase Agreement, Kolstein continued to assert dominion and control over KMI's assets without authorization from Mr. Alvarez.

18.     In certain instances, Kolstein transacted directly with KMI customers to the detriment of the Debtor, its creditors, and its business operations. A true and correct copy of a text message exchange detailing Kolstein's unauthorized activity with a current or prospective clients of KMI is attached hereto as **<u>Exhibit "C"</u>**.

19.     Kolstein also made it a practice to assert dominion and control over KMI's assets to obtain personal tax benefits.

20.     On or around February 19, 2025, Kolstein self-appraised two of KMI's instruments for the collective value of $49,000.00, transferred the instruments to the International Society of Bassists ("ISOB"), and completed the Noncash Charitable Contribution Form 8283 to claim personal tax benefits associated with the donation of KMI's assets. True and correct copies of Kolstein's appraisal, tax forms, and ISOB's acknowledgment of receipt of KMI's assets are attached hereto as **Composite Exhibit "D"**.

21.     Upon information and belief, Kolstein completed several "donations" of the Debtor's assets exceeding $200,000.00 in value in order to receive personal tax benefits.

22.     In exchange for the fraudulent donations to the ISOB, the Debtor received nothing of value in return.

23.     Following the Acquisition, Kolstein continued to exert dominion and control over the Debtor's assets and financial affairs without authority. Specifically, Kolstein took and maintained possession of the Debtor's assets without proper authority; executed sales and retained sale proceeds without authority and to the detriment of the Debtor's business and estate; and asserted managerial-type control over the Debtor's operations without proper authority and contrary to the best interests of KMI and its estate.

24.     Kolstein remains in possession, custody or control of KMI's assets and sale proceeds which he has failed to turnover to the Debtor.

25.     Over the course of Kolstein's self-dealing with KMI's assets after the Acquisition, Debtor experienced financial losses to the detriment of its business and estate which ultimately caused KMI's Chapter 11 filing.

26.     In fact, the Debtor's Chapter 11 filing can be traced directly to the tortious conduct of Kolstein following the Acquisition.

**Debtor's Bankruptcy Case**

27.     On June 8, 2025 (the "Petition Date") , Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code")  and elected to proceed with its restructuring under Subchapter V.

28.     On the Petition Date, an estate was created which is comprised of all legal and equitable interests KMI retains in assets wherever such are located and by whomever held.

29.     Shortly after the Petition Date, Kolstein received notice of the Debtor's Chapter 11 case.

30.     On August 18, 2025, Kolstein filed (or caused the filing) of his proof of claim in the Debtor's bankruptcy case in the amount of $170,062.17, which claim was designated Claim #12-1 (the "Claim").

31.     The basis for the Claim is stated to be "Breach of Stock Purchase Agreement" although KMI retained no continuing obligations to Kolstein after the Acquisition.

32.     In his Claim, Kolstein also asserts a security interest in "All assets of the Debtor" which interest (if any) is not properly perfected as Kolstein failed to attach any documentation which seemingly supports his security interest claim.

## COUNT I – TURNOVER OF PROPERTY OF THE ESTATE

33.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 27 above as if fully set forth herein.

34.     At all material times, Kolstein has remained in possession of assets of KMI which he has failed to return or turnover to the Debtor.

35.      Upon receipt of notice of the Debtor's Chapter 11 filing, Kolstein was required pursuant to 11 U.S.C. §§ 362 and 542 of the Bankruptcy Code, to turnover any property to KMI which he retained in his possession, custody and control.

36.     Pursuant to 11 U.S.C. § 542, KMI is entitled to possession of all property of its bankrupt estate, which property includes, but is not limited to, all musical instruments, musical instrument accessories, musical instrument repair tooling and equipment, supplies, and sale proceeds associated with the sale of KMI's property.

37.     Despite notice of KMI Chapter 11 case and the requirements of 11 U.S.C. §§ 362 and 542 of the Bankruptcy Code, Kolstein has refused to turnover KMI's property.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter judgment against Kolstein as follows:

(a)     directing Kolstein to turnover all property of KMI's bankruptcy estate by a date certain;

(b)     finding that Kolstein is in contempt of Court for violating 11 U.S.C. §§ 362 and 542 of the Bankruptcy Code;

(c)     awarding KMI damages based on Kolstein's violation of 11 U.S.C. §§ 362 and 542 of the Bankruptcy Code; and

(d)     granting such other and further relief as this Court deems just and proper.

## COUNT II – CONSTRUCTIVE FRAUDULENT TRANSFER

38.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 31 as if fully set forth herein.

39.     This is an action to recover fraudulent transfers pursuant to 11 U.S.C. §§ 548 and 550.

40.     Within two years prior to the Petition Date, KMI transferred its personal property to or for the benefit of Kolstein.

41.     KMI's transfer of personal property was a transfer of property of the Debtor.

6

42.     The Debtor was insolvent at the time of the transfer or became insolvent as a result thereof.

43.     The transfer is avoidable under 11 U.S.C. § 548(a)(1)(B).

44.     Pursuant to 11 U.S.C. § 550(a), the recovery of the transfer is authorized to the extent the transfer is avoided under 11 U.S.C. § 548.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Kolstein (i) avoiding the transfer of Debtor's property; (ii) recovering the personal property transferred or the value of such personal property from Kolstein pursuant to 11 U.S.C. § 550; (iii) declaring the personal property transferred to Kolstein to be property of the Debtor's estate free and clear of the interests of Kolstein; (iv) granting all costs from this action; (v) disallowing any and all claims by Kolstein, if any, unless Kolstein has returned to the Debtor's estate the value of the transfers for which Kolstein is liable pursuant to 11 U.S.C. § 550; and (vi) for such other and further relief as the Court deems just and proper.

## COUNT III – CONVERSION

45.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 30 as if fully set forth herein.

46.     At all material times hereto, KMI has maintained a right to possession, custody and control of its assets.

47.     Despite KMI's rights, Kolstein has exercised dominion and control over KMI's assets with knowledge of the Debtor's right and claims to such assets.

48.     Kolstein's continued dominion and control over the Debtor's assets has prevented KMI from possession and control of such assets during the course of its business operations resulting in damages to the Debtor's Chapter 11 estate.

**WHEREFORE**, Plaintiff demands all consequential and punitive damages against Kolstein for the willful conversion of estate property in an amount to be determined at trial, and such other relief this Court deems appropriate.

## COUNT IV – AVOIDANCE OF LIEN PURSUANT TO 11 U.S.C. § 544

49.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 30 as if fully set forth herein.

50.     This is an action to avoid a lien under the provisions of 11 U.S.C. § 544.

51.     In connection with the Stock Purchase Agreement, Kolstein attempted to take a security interest in KMI's assets but failed to properly perfect such interest by filing a financing statement, notice of lien, or other record identifying its security interest in the appropriate public records.

52.     Accordingly, due to Kolstein's defective security interest, Debtor requests avoidance of any asserted lien by Kolstein pursuant to 11 U.S.C. § 544 of the Bankruptcy Code.

**WHEREFORE**, Plaintiff requests this Court enter a judgment against Kolstein and in favor of the Debtor avoiding Kolstein's assert lien pursuant to 11 U.S.C. § 544 of the Bankruptcy Code, and such other further relief as the Court deems just, fair and equitable.

## COUNT V – EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. § 510(c)

53.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 30 as if fully set forth herein.

54.     KMI does not concede that Kolstein retains an enforceable or allowable claim in its bankruptcy case. However, to the extent Kolstein's Claim is allowed, it must be equitably subordinated pursuant to 11 U.S.C. § 510(c) due to Kolstein's inequitable conduct specifically as it pertains to the fraudulent transfer of the Debtor's assets, the unauthorized retention of Debtor's assets, and interference with its ongoing business operations.

55.     Kolstein's conduct has harmed other creditors of the bankruptcy estate and has diminished KMI's cash flow contributing to its insolvency.

56.     The equitable subordination of Kolstein's Claim is warranted under 11 U.S.C. § 510 and would be consistent with the principle and purposes of the Bankruptcy Code and its policies.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a final judgment in favor of KMI and against Kolstein, equitably subordinating Kolstein's Claim to the claims of all other unsecured creditors to the extent allowed, pursuant to 11 U.S.C. § 510 and granting such other and further relief as the Court deems appropriate.

## COUNT VI – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

57.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 31 as if fully set forth herein.

58.     KMI had an advantageous business relationship with Wanhao Xu ("Client")which it expected to continue.

59.     KMI's business relationship with Client included the probability of future economic benefit to KMI in the form of revenues and fees from the sale, rental, repair or consignment of musical instruments.

60.     Kolstein was aware of KMI's business relationship with Client.

61.     Kolstein maliciously and intentionally interfered with KMI's business relationship in an unlawful and wrongful manner.

62.     As a direct and proximate result of Kolstein's intentional actions, KMI suffered economic harm, including without limitation loss of revenues and fees.

63.     Accordingly, KMI has suffered damage as a result of Kolstein's tortious interference with KMI's business relations in an amount to be established at trial, but in any event an amount no less than $50,000.00.

**WHEREFORE**, Plaintiff requests this Court enter a judgment against Kolstein in an amount to be determined at trial as compensatory and punitive damages, and such other further relief as the Court deems just, fair and equitable.

## COUNT VII – DISALLOWANCE OF KOLSTEIN'S CLAIM

64.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 30 as if fully set forth herein.

65.     Plaintiff (KMI) does not concede that Kolstein holds a valid or enforceable claim in this bankruptcy case.

66.     Plaintiff contends that the Claim should be disallowed in accordance with 11 U.S.C. § 502(d) of the Bankruptcy Code due to Kolstein's refusal to turnover property subject to recovery by the Debtor pursuant to 11 U.S.C. §§ 542 and 548.

67.     Plaintiff also contends the Claim should be disallowed in its entirety as Debtor is not financially obligated to Kolstein under the terms and conditions of the Stock Purchase Agreement.

**WHEREFORE**, Plaintiff requests this Court enter an order disallowing the Claim in its entirety and granting such other further relief as the Court deems appropriate.

## RESERVATION OF RIGHTS

Plaintiff reserves the right to amend this Complaint upon completion of its investigation and discovery in order to assert any additional claims for relief against Kolstein. In addition, nothing set forth herein is intended, nor deemed, to modify, limit, release, reduce, or waive any of

the Plaintiff's rights, claims, remedies, or privileges at law or in equity, all of which are specifically

preserved.

**RESPECTFULLY SUBMITTED** this 26th day of August, 2025.

/s/ Daniel A. Velasquez
Daniel Velasquez, Esq.
Florida Bar No.
dvelasquez@lathamluna.com
**LATHAM, LUNA, EDEN & BEAUDINE, LLP**
201 S. Orange Avenue, Suite 1400
Orlando, Florida 32801
Tel: (407) 481-5800
Fax: (407) 481-5801
*Attorneys for Kolstein Music, Inc.*

EXHIBIT "A"

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement") dated as of the 7th day of August, 2019, is by and among Manny Alvarez, an individual residing at 3520 Anchor Pl., Oceanside, NY 11572 ("Purchaser"), Barrie Kolstein, an individual residing at 3000 Montgomery St., Wantagh, NY 11793 ("Seller"), and Kolstein Music Inc., a New York corporation with an address at 795 Foxhurst Road, Baldwin, NY 11510 (the "Company").

W I T N E S S E T H :

WHEREAS, Seller owns 100% of the Company's stock (the "Shares");

WHEREAS, Purchaser desires to purchase 100% of the Shares the Seller, and the Seller desires to sell the Shares to Purchaser, upon the terms and conditions set forth in this Agreement; and

WHEREAS, certain defined terms are set forth in Section 14 hereof.

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations, and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Purchase Price.  On the terms and subject to the conditions set forth in this Agreement, at the Closing the Seller shall sell, assign, convey, transfer and deliver 100% of the Shares to the Purchaser, and the Purchaser shall purchase and acquire 100% the Shares from Seller, for an aggregate purchase price of One Million, Forty Thousand, Eight Hundred Forty and Ninety Eight Hundredths Dollars ($1,040,840.98) (the "Purchase Price"), in addition to all other covenants herein and within the Transaction Documents.

Upon execution of this Agreement, Purchaser shall pay to Seller a non-refundable deposit in the amount of Ten Thousand Dollars ($10,000) by cash, cashier check, or wire transfer ("Deposit Amount"), which shall be credited to the Down Payment.

2.  Transfer of Shares.

(a)  Upon Closing, Seller shall transfer to Purchaser 100% of all voting Shares in the Company, subject to all terms and conditions of the Bylaws and Certificate of Incorporation of the Company. The Company shall, at Closing, acknowledge and accept Purchaser as a Shareholder of the Company. Purchaser understands and acknowledges that other than as set forth herein, he shall have no right to, by virtue of being a Shareholder of the Company or otherwise, any cash on hand belonging to the Company existing as of the Closing Date; all cash held in any bank account belonging to the Company shall be withdrawn and distributed to Seller on the Closing Date.

3.     Closing.

(a)     Subject to Section 12 hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at offices of Robert G. Bruechert, Attorney at Law, P.C., as of August 7, 2019 or at such other place or time as agreed to by the parties hereto; provided, however, if all of the conditions to the obligations of the parties set forth in Sections 8 and 9 hereof (other than conditions with respect to actions the respective parties will take at the Closing itself) have not been satisfied or waived on or prior to such date, the parties may mutually agree to delay the Closing to a future date, or else this transaction shall not consummate.  The date on which the Closing actually occurs is herein referred to as the "Closing Date."

(b)     At the Closing, and upon the terms and subject to the conditions set forth in this Agreement, the parties to this Agreement shall take the following actions, which shall be deemed to have occurred simultaneously:

(i)     The Purchaser shall pay to the Seller, by certified check or wire transfer of immediately available funds to an account or accounts designated by Seller, an amount equal to One Hundred Thousand Dollars ($100,000) ("Down Payment"), less any amounts already paid by Purchaser to Seller as the Deposit Amount;

(ii)     The Purchaser shall deliver to the Seller a five-year promissory note, in the form attached hereto as Exhibit A, in the principal amount of Two Hundred Thousand Dollars ($200,000.00) bearing an interest of 2.75% per annum, compounding monthly, payable in accordance with its terms ("Promissory Note").

(iii)     The Purchaser shall deliver to Seller a ten-year promissory note, in the form attached hereto as Exhibit B, in the principal amount of Seven Hundred Forty Thousand, Eight Hundred Forty and Ninety Eight Hundredths Dollars ($740,840.98), bearing an interest of 2.75% per annum, compounding monthly, payable in accordance with its terms (together the promissory notes in this section and the preceding section are referred to herein as the "Promissory Notes").

(iv)     The Company and the owner or landlord of the premises currently leased by the Company shall have executed and delivered to each other a lease agreement for the use of the property located at 795 and 803 Foxhurst Rd., Baldwin, NY 11510 ("Lease Agreement"), commencing on the Closing Date. The Lease Agreement shall be a triple-net lease, for a ten year term, and offer the Company abated rent for the first 24 months. At the conclusion of the first 24-months of the leasehold, the Lease Agreement shall provide for the option to purchase the properties at fair market value. Notwithstanding the foregoing, the Lease Agreement shall expire with respect to 795 Foxhurst Rd upon consummation of the Real Property Purchase Agreement, defined below. The Lease Agreement shall be in substantially the same form as attached hereto as Exhibit E.

(v)     The Purchaser (or an entity in which Purchaser owns a majority or controlling interest) and the owner of 795 Foxhurst Rd., Baldwin, NY 11510 shall have commenced and negotiated in good faith agreement for the purchase of such real property, along with all ancillary documents, whose closing date shall be the Closing Date ("Real Property Purchase Agreement"). The Real Property Purchase Agreement shall sell the aforementioned real property to the Purchaser for the amount of $450,000; $10,000 shall be due on the Closing Date, and the remaining balance shall be paid over the course of ten (10) years in equal monthly payments, accruing interest at a rate of 3% simple interest. The payment of such balance shall be secured by a mortgage in favor of the seller of real estate, to be properly recorded.

(vi)     The Seller shall deliver to Seller stock certificates representing all of Seller's Shares ("Stock Certificates"), and such instruments or authorizations necessary to effect the transfer of ownership to Purchaser;

(vii)     The Company shall have executed a consignment agreement with Kolstein Instrument Inventory LLC, commencing as of the Closing Date, in which Kolstein Instrument Inventory LLC shall supply certain inventory to the Company for resale on a consignment basis ("Consignment Agreement"). The Consignment Agreement shall be in a form substantially similar to that attached hereto as Exhibit C.

(viii)     The Purchaser shall have delivered to Seller collateral assignments of life insurance policies in accordance with the terms of the Promissory Notes.

(ix)     The Purchaser and Seller shall execute and deliver, as applicable, all other Transaction Documents, and perform all other tasks required to meet the conditions provided in Sections 8 and 9 herein.

(x)     The Seller shall execute and deliver his resignation to the Company of any position Seller currently holds with the Company.

(xi)     Seller shall deliver to Purchaser all of the books and records of the Company.

(c)     The Closing shall not be deemed to have occurred until each of the deliveries and actions described in Section 3(b) has occurred and any other conditions set forth in Sections 8 and 9 shall have been satisfied or waived by the party entitled to the benefit thereof.

4.     Representations and Warranties of the Seller.     The Seller represents and warrants to Purchaser and shall be deemed to have repeated all such representations and warranties upon Closing, as follows:   The Seller owns the Shares, and has all requisite power and authority to enter into this Agreement and to perform his obligations hereunder.  Except as may result from any facts or circumstances relating solely to the Purchaser, neither the execution and delivery of this Agreement by the Seller, nor the consummation of the transactions contemplated hereby by the Seller (a) will conflict with or violate any provision of the Certificate of Incorporation or prior Bylaws of the Company, (b) will conflict with, or result in any breach of, any term, condition or provision of, or constitute a default under, or give rise to any right of termination,

modification, cancellation or acceleration under (whether after the giving of notice or lapse of time or both), any contract, mortgage, lien, lease, agreement, indenture, license, franchise, instrument, order, judgment or decree to which the Seller is a party or bound, (c) will violate any statute, law, rule or regulation applicable to the Seller, or (d) require the Seller to obtain any third party approval, consent or authorization, except as otherwise provided herein.   No broker, finder, or investment banker is entitled to any brokerage, finder's, or other similar fee or commission in connection with the transactions hereunder based upon arrangements made by or on behalf of Seller.

5.     <u>Representations and Warranties of the Company.</u>  The Company represents and warrants to Purchaser, and shall be deemed to have repeated all such representations and warranties upon Closing, as follows:

(a)     The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of New York, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)     The Company is duly qualified to do business and is in good standing in all jurisdictions (each such jurisdiction is set forth in <u>Schedule 5(b)</u> hereto) in which such qualification is necessary because of the character of the properties owned, leased or operated by it or the nature of its activities, except where the failure to be so qualified would not have a Material Adverse Effect.

(c)     The Shares of the Seller constitute all of the authorized and issued Shares in the Company as of the date hereof.

(d)     The Company has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder.  The execution and delivery of this Agreement and the performance by the Company of its obligations hereunder have been duly and validly authorized by all necessary action of the Company.

(e)     Except as may result from any facts or circumstances relating solely to the Purchaser (for purposes of clarity, the change of control of the Company resulting from the transactions contemplated hereby does not relate solely to the Purchaser), neither the execution and delivery of this Agreement by the Company, nor the consummation of the transactions contemplated hereby by the Company (i) will conflict with or violate any provision of the Certificate of Incorporation or prior Bylaws of the Company, (ii) will conflict with, or result in any breach of, any term, condition or provision of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (whether after the giving of notice or lapse of time or both), any Material Contract, order, judgment or decree to which the Company is a party or bound, (iii) will violate any statute, law, rule or regulation applicable to the Company, (iv) will result in the creation or imposition of any Lien upon any Asset, or (v) will require the Company to obtain any third party approval, consent or authorization, except as otherwise provided herein, and subject to Section 7(k).

(f)     Except those that would not, individually or in the aggregate, be material to the

4

Company, there are no debts, liabilities or obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, or determined or determinable, of the Company, whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, other than any such debts, liabilities or obligations set forth on a schedule of debts annexed hereto, and those that are incurred in the ordinary course of business between the execution of this Agreement and the Closing.

(g)     The Company has good and marketable title to, or a valid leasehold interest in, all tangible assets used by it that are necessary in the operation of its business as conducted prior to the Closing (collectively, the "Assets"), as set forth on a Schedule of Assets annexed hereto, free and clear of any Liens, other than Permitted Liens.  THE SELLER AND COMPANY MAKE NO REPRESENTATION OR WARRANTY WITH REGARD TO THE CONDITION OF THE ASSETS. PURCHASER HEREBY ACKNOWLEDGES THAT HE IS PURCHASING THE ASSETS "AS-IS," HE HAS HAD A FULL AND FAIR OPPORTUNITY TO INSPECT THE ASSETS, AND THE ASSETS ARE IN SATISFACTORY OPERATING CONDITION AND REPAIR. THE SELLER AND COMPANY WAIVE ALL WARRANTIES, EXPRESS OR IMPLIED, WITH REGARD TO THE ASSETS INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

(h)     Since the date of execution of this Agreement, the Company has conducted its business in the ordinary course of business, and to the Company's Knowledge, the Company has not, except pursuant to or as contemplated by this Agreement:

(i)     incurred any damage, destruction or similar loss, whether or not covered by insurance, materially adversely affecting the business, assets or properties of the Company;

(ii)     other than in the ordinary course of business, or as disclosed in writing to the Purchaser, sold, assigned, leased, transferred or otherwise disposed of any of the Assets or its intellectual properties, including, without limitation, any patent, trademark, trade name, copyright, license, franchise, design or other intangible asset or intellectual property right (but excluding, for purposes of clarity, dividends or distributions of cash to the Seller);

(iii)     other than in the ordinary course of business, mortgaged, pledged, granted or suffered to exist any Lien (other than a Permitted Lien) on any of the Assets or Trade Rights;

(iv)     other than in the ordinary course of business, waived any rights of material value or canceled, discharged, satisfied or paid any debt, claim, Lien, liability or obligation, whether absolute, accrued, contingent or otherwise and whether due or to become due;

(v)     incurred any obligation or liability (absolute or contingent, liquidated or unliquidated, choate or inchoate), except obligations and liabilities incurred in the ordinary course of its business or which are immaterial in amount;

(vi)     other than in the ordinary course of business and consistent with past practices, entered into, made any amendment of, or terminated any Material Contract;

(vii)    effected any change in the accounting practices or procedures of the Company, other than as a result of required changes in GAAP;

(viii)    paid, loaned or advanced any amount to, or sold, transferred or leased any properties or assets (real, personal or mixed, tangible or intangible) to, or entered into any agreement, arrangement or transaction of any nature with, any Shareholder, or any officer of the Company or any Person in which any Shareholder or officer of the Company has any direct or indirect interest, except for payments of compensation and distributions to Shareholders;

(ix)    increased the compensation payable to any of the Company's Shareholders, officers or employees (other than in the ordinary course of business) or become obligated to increase any such compensation; or

(x)    entered into any other transaction other than in the ordinary course of business and consistent with past practices, or changed in any material respect the business policies or practices of the Company.

(i)    The Company has duly filed all foreign, Federal, state, county and local income, excise, sales, property, withholding, social security, franchise, license, and information tax returns and reports required to have been filed by the Company to the date of closing, and paid any associated tax, fee, dues, penalties, cost or expense. Each such return was true, complete and correct in all material respects.

(j)    Other than those contracts, agreements and commitments listed in <u>Schedule 5(j)</u> hereto (true, complete and correct copies of each of which have been heretofore delivered to the Purchaser) (collectively, "<u>Material Contracts</u>"), other than contracts, agreements or commitments which are cancellable by the Company on 30 days' notice or less without penalty, and other than any agreement (or group of related agreements)  the performance of which involves the likelihood of payment or receipt of consideration less than $10,000 in any calendar year, the Company is not a party to any contract, agreement or commitment of any kind or nature whatsoever, written or oral, formal or informal, whether or not in the ordinary course of business.   Each of the Material Contracts is in full force and effect, and enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally and general equitable principles. Neither the Company nor, to the Company's Knowledge, any other party to any Material Contract is in default under the terms thereof in any material respect.  No claim of default by any party to a Material Contract is now pending, and to the Company's Knowledge no event exists which, with or without the lapse of time or the giving of notice, or both, would constitute a breach or default, cause acceleration of any obligation, or would permit the termination or excuse the performance by any party thereto, except where such breach, default, acceleration, termination or excuse would not have a Material Adverse Effect.

(k)    The books and records of the Company with respect to its accounts receivable are accurate and correct in all material respects.  Each account receivable existing on the Closing

Date is collectible in the ordinary course of business in accordance with its terms, and at the recorded amount thereof, using normal and historical collection practices.  Each account receivable reflected on the Financial Statements constitutes a bona fide receivable in the ordinary course of business.

(l)      The Company does not own any real property.  <u>Schedule 5(l)</u> hereto contains a true, complete and correct list of all premises leased in whole or in part by the Company (the "<u>Leased Premises</u>").  <u>Schedule 5(l)</u> also lists all guarantees of any leases given by the Company for any other Person.  True, complete and correct copies of each such lease and lease guarantee to which the Company is a party have been heretofore delivered to the Purchaser. The Company is a tenant or possessor in good standing thereunder, free of any default or breach whatsoever with respect to each Leased Premise, and the Company has the legal right to possess and quietly enjoy the Leased Premises pursuant a lease of such Leased Premises. Each rental and other payment due thereunder has been duly made; each act required to be performed which, if not performed, would constitute a material breach thereof has been duly performed; no act forbidden to be performed has been performed thereunder which, if protested, would constitute a material breach thereof; and there is not under any such lease or other agreement any default or claim of default or event which, with or without notice or the lapse of time, or both, would constitute a breach or default thereunder.

(m)      Set forth on <u>Schedule 5(m)</u> hereto is a true, complete and correct list, in all materially respects, of all tangible personal property owned or leased by the Company having a book value at the date hereof in excess of $1,000 per item.

(n)      Set forth on <u>Schedule 5(n)</u> hereto is a true, complete and correct list, together with a brief description (including, if applicable, date of application, filing or registration, as the case may be, and the registration or application number), of each patent, registered trademark, and registered copyright owned by or licensed to the Company (collectively, the "<u>Trade Rights</u>"). The Company owns, or has the right to use, each Trade Right necessary to the conduct of its business as now operated and, to the Company's Knowledge, there are no conflicts with, or infringements of, the rights of others in respect thereof or any unauthorized use or misappropriation of any thereof. The Company shall continue to possess such Trade Rights upon Closing, subject to the terms of any listed licensing agreements.

(o)      Set forth on <u>Schedule 5(o)</u> hereto is a true, complete and correct list of all insurance policies, including, without limitation, liability, burglary, theft, fidelity, life, fire, product liability, workmen's compensation, health and other forms of insurance of any kind held by the Company (collectively, the "<u>Policies</u>").  Each Policy is enforceable in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally and general equitable principles), and in full force and effect; the Company is the sole beneficiary of each Policy; no Policy, or the future proceeds thereof, has been assigned to any other Person; all premiums and other payments currently due from the Company under, or on account of, each Policy (taking into account any grace period) have been paid; and the Company has not received any written notice that any such Policy is being canceled or terminated.   To the Company's Knowledge, each Policy is adequate for the business in which the Company is

engaged. True, complete and correct copies of each Policy have been heretofore delivered to the Purchaser.

(p)    No action, suit, claim, arbitration, governmental investigation or proceeding, whether legal or administrative or in mediation or arbitration, is pending or, to the Knowledge of the Company, threatened, at law or in equity or admiralty, before or by any court or Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, against the Company in which an unfavorable judgment, decree or order would restrain, prohibit, invalidate, set aside, rescind, prevent or make unlawful this Agreement or the carrying out of this Agreement or the transactions contemplated hereby; nor, to the Company's Knowledge, is there any basis for any such action, suit, claim, investigation or proceeding. There is no pending action, suit or proceeding which has been brought by or on behalf of the Company in any court, before any governmental agency or arbitration tribunal. The Company is not in default with respect to any order, writ, or decree of any court or any federal, state, municipal or other governmental department, bureau, agency or instrumentality, that is binding on the Company.

(q)    The Company has all material permits, licenses, orders and approvals of all Federal, state or local governmental regulatory bodies required for it to conduct its business as presently conducted; all such permits, licenses, orders and approvals are in full force and effect and no suspension or cancellation of any of them is pending or, to the Company's Knowledge, threatened.  The Company is in compliance, in all material respects, with each law, rule and regulation applicable to its business as presently conducted by it including, without limitation, laws, rules and regulations respecting occupational safety, environmental protection and employment practices. The Company's conduct of its business is in conformance, in all material respects, with the requirements and regulations of the Occupational Safety and Health Administration.

(r)    No broker, finder, or investment banker is entitled to any brokerage, finder's, or other similar fee or commission in connection with the transactions hereunder based upon arrangements made by or on behalf of the Company.

(s)    Notwithstanding anything to the contrary, it is the intention of the parties that the checking account of the Company shall contain $1,000 as of the Closing. Anything in excess of this amount shall be distributed to Seller prior to the Closing, and Purchaser shall have no claim to such funds.

(t)    The Company has no knowledge of any Environmental Condition (as defined below) at, under or within any premises owned, leased or otherwise used or occupied by the Company (solely for the purposes of this subparagraph, hereinafter collectively referred to as the "Premises"), and the Company has operated in compliance with all applicable Environmental Laws hereinafter defined. The term "Environmental Condition" means any environmental condition respecting the Premises of any nature, including, without limitation, the existence of any hazardous materials or substances, and other environmental conditions and/or violations of Environmental Laws (as defined below), at, on, under or within the Premises, or the migration of hazardous materials or substances from or to any adjacent property. As used in this Agreement, the term "hazardous materials or substances" means (i) hazardous wastes, hazardous substances,

hazardous constituents, toxic substances or related materials, whether solids, liquids or gases, including, but not limited to, asbestos, mold, polychlorinated biphenyls, petroleum products and substances defined as "hazardous wastes," "hazardous substances," "toxic substances," "pollutants," "contaminants," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended 42 U.S.C. §9601 et seq. and all amendments thereto; the Toxic Substance Control Act, 15 U.S.C. 2601 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. 1802; the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq.; the Clean Water Act, 33 U.S.C. §1251 et seq.; the Safe Water Drinking Act, 42 U.S.C. §300 et seq.; the Clean Air Act 42 U.S.C. §7401 et seq.; the New York State Environmental Liability Review Act, New York Environmental Conservation Law (ECL) §§8-0101 et seq., and the New York State Water Pollution Control Act, ECL §§17-0101 et seq.; and all other laws, rules, regulations and policies concerning environmental matters and affecting or relating to the Premises; and in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated pursuant to the preceding laws or other similar Federal, state or local laws, regulations, rules or ordinances now or hereafter in effect relating to environmental matters (collectively, the "Environmental Laws"); and (ii) any other substances, constituents or wastes subject to any applicable Federal, state or local law, regulation or ordinance, including any Environmental Law, now or hereafter in effect, including, but not limited to, petroleum, refined petroleum products, waste oil, waste aviation or motor vehicle fuel and asbestos, but excluding any such substances in such quantities which are normally used or stored, in accordance with industry standard, as reasonably necessary for the operation of the Seller's business, provided same are used and stored consistent with all applicable law.

(u)      From the date hereof, and through and including the date Seller shall maintain a segregated bank account for all deposits and payments related to music instrument rentals for the rental of any music instruments any period covering a period of time from the date hereof and thereafter. Notwithstanding Section 2 above, Seller shall convey, and Purchaser shall be entitled to any such deposits and payments at Closing.

6.      <u>Representations and Warranties of the Purchaser</u>. The Purchaser represents, warrants and covenants to the Company and the Seller, and shall be deemed to have repeated all such representations, warranties, and covenants upon Closing, as follows:

(a)      The Purchaser has all power and capacity to execute and deliver this Agreement and each of the Transaction Documents to which he is a party, and to consummate the transactions contemplated hereby and thereby. The Purchaser has duly executed and delivered this Agreement and, at or prior to the Closing, and will have duly executed and delivered each Transaction Document to which he is a party. This Agreement constitutes, and at the Closing each such Transaction Document will constitute, his legal, valid and binding obligation, enforceable against him in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance or other similar laws affecting the enforcement of creditors' rights generally and general equitable principles.

(b)      The execution, delivery and performance by the Purchaser of this Agreement and each Transaction Document to which he is a party, and the consummation of the transactions

contemplated hereby and thereby, do not and will not (i) violate, contravene, conflict with, constitute or result in a breach of or a default under (with or without the giving of notice or the lapse of time or both), create in any other Person a right of acceleration or termination under, or require amendment of any right under, any agreement to which the Purchaser is a party or by which any of his properties may be bound or affected, or (ii) violate any law to which the Purchaser is subject.

(c)     No consent, approval, license, permit, order, qualification or authorization of, or registration, declaration, notice or filing with, any Governmental Authority or any other Person is required for or in connection with the execution and delivery by the Purchaser of this Agreement or any Transaction Document to which he is a party, or the consummation by the Purchaser of the transactions contemplated hereby and thereby.

(d)     The Purchaser is acquiring the Shares solely for his own account for investment and not with a present view to, or for sale in connection with, any distribution thereof in violation of applicable securities laws.  The Purchaser understands that he may not, directly or indirectly, offer, transfer, sell, pledge, hypothecate or otherwise dispose of any of the Shares except in compliance with the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "Act"), applicable State securities laws, and the Bylaws.  The Purchaser further understands, acknowledges and agrees that none of the Shares may be transferred (i) unless the provisions of the Certificate of Incorporation and Bylaws shall have been complied with, (ii) unless such disposition is compliant with all terms and conditions of this Agreement and each Transaction Document; and (iii) unless such disposition is pursuant to an effective registration statement under the Act and is exempt from (or in compliance with) applicable state securities laws, or is exempt from the provisions of Section 5 of the Act and is exempt from (or in compliance with) applicable state securities laws.

(e)     The Purchaser's knowledge and experience in financial and business matters is such that he is capable of evaluating the merits and risk of the investment in the Shares.  In furtherance of the foregoing, the Purchaser represents and warrants that (i) except as set forth herein, no representation or warranty, express or implied, whether written or oral, as to the financial condition, results of operations, prospects, properties or business of the Company or as to the desirability or value of an investment in the Company has been made to him by or on behalf of the Company or any other Person, and the Purchaser is not relying upon any information conveyed to the Purchaser either in writing or orally regarding his investment in the Company, (ii) the Purchaser has relied upon his own independent appraisal and investigation, and the advice of his own counsel, tax advisors and other advisors, regarding the risks of an investment in the Company and (iii) the Purchaser will continue to bear sole responsibility for making his own independent evaluation and monitoring of the risks of his investment in the Company.

(f)     The Purchaser is an "accredited investor" as such term is defined in Rule 501(a) promulgated under the Act.

(g)     No broker, finder, or investment banker is entitled to any brokerage, finder's, or other similar fee or commission in connection with the transactions hereunder based upon

arrangements made by or on behalf of the Purchaser.

(h)     Purchaser has had full and fair opportunity through the Closing Date to access books, records, and other documents of the Company contemplated by this Agreement, and received all documents, other than Transaction Documents, which are required to be provided to Purchaser herein. Except as provided by Purchaser in writing, Purchaser waives all right to any claim that Purchaser lacked such full and fair opportunity, and Purchaser waives and discharges any obligation for any document required by this Agreement to be furnished to Purchaser, other than Transaction Documents. The foregoing shall not be construed to apply to any act of fraud or fraudulent misrepresentation by the Seller.

7.     <u>Covenants.</u>

(a)     Between the date hereof and the Closing Date, the Company shall give to the Purchaser and its authorized representatives reasonable access during normal business hours to all the properties, books, contracts, tax returns and records of the Company that the Purchaser may reasonably request (provided that such access does not unreasonably disrupt or interfere with  the normal operations of the Company), and shall furnish copies of such documents and records of the Company as the Purchaser may reasonably request, in each case at the Purchaser's sole expense and solely for the purpose of verifying the representations and warranties of the Seller and the Company herein and for the purpose of reasonable post-Closing transition planning.  Notwithstanding anything to the contrary in this Agreement, (i) the Company shall not be required to provide such access, disclosure, or copies if doing so would breach or contravene any attorney-client privilege or any applicable laws, fiduciary duty or agreement binding on the Company; and (ii) Purchaser agrees that it will not contact any customer, supplier, employee (other than the Seller) or other business relation of the Company without first obtaining authorization from the Company (such authorization not to be unreasonably withheld).

(b)     From the date hereof through the Closing Date, the Company shall (i) consult with the Purchaser with respect to all operating decisions which the Seller reasonably expects to result in a change in the business of the Company as presently operated or which are not in the ordinary course of the business of the Company, and (ii) subject to the preceding sentence, the Company shall operate its business as presently operated and only in the normal and ordinary course and, consistent with such operation, make reasonable efforts to maintain and preserve the Assets and its properties in good condition and repair, reasonable wear and tear excepted, to continue sales at not less than the present rate, to preserve intact its present business organization, to keep available to the Purchaser the present services of its officers and employees, to preserve for the Purchaser the goodwill of its suppliers, customers, landlords and others having business relationships with the Company, to maintain in full force and effect all Policies (or to obtain replacement policies providing coverage that is equally sufficient as the Policy it replaces), and to comply in all material respects with all laws or regulations affecting operation of its business.

(c)     The Company will promptly notify the Purchaser in writing if it discovers that any representation or warranty made by the Company or the Seller in this Agreement was, when made, untrue in any material respect.  The Company shall have the right from time to time prior

to the Closing to amend or supplement the Schedules (or if necessary, amend or supplement this Agreement solely to provide for the appropriate cross-references to the Schedules) with respect to any matter that arises or becomes known by the Company or the Seller after the date hereof and that would have been required or permitted to be set forth or described in the Schedules had such matter existed or been known as of such date.

(d)     Each party hereto shall use reasonable efforts to take, or cause to be taken, all actions and do or cause to be done all things necessary, proper or advisable to consummate the transactions contemplated by this Agreement, including, without limitation, to obtain all consents, approvals and authorizations of, to make all filings with, and to give all notices to, third parties which may be necessary or required in order for such party to effectuate the transactions contemplated hereby.

(e)     Prior to the Closing, the Seller will not solicit the sale of any of the Shares to any Person or enter into any agreement, arrangement or understanding (other than this Agreement or the Transaction Documents) with respect to the sale or other disposition of any of the Shares or any option, call or commitment with respect thereto. The Company will not solicit the sale or other disposition of the business of the Company or any of the Assets or other properties to any Person, or enter into any agreement, arrangement, understanding, option, call or commitment with respect to the same, except in each case for the furnishing of products or services and related activities in the ordinary course of business.

(f)     All rights to indemnification and exculpation (including the advancement of expenses) from liabilities for acts or omissions occurring at or prior to the Closing (including with respect to the transactions contemplated hereby) in favor of the current (as of immediately prior to the Closing Date) or former Shareholders, officers or employees of the Company, as provided in the Certificate of Incorporation or the Bylaws of the Company or pursuant to applicable law shall survive the Closing and shall continue in full force and effect without amendment, modification or repeal in accordance with their terms.

(g)     The Purchaser acknowledges that the information being provided to it in connection with the transactions contemplated hereby is being provided pursuant to the terms of a confidentiality agreement dated as of _____, between the Purchaser and the Company (the "Confidentiality Agreement").

(h)     Each of the Purchaser and the Seller shall be solely responsible for any federal, state or local taxes imposed by law upon him as a result of the consummation of the transactions contemplated hereby, and the parties shall cooperate in providing any documents or affidavits necessary for any filings in connection therewith.

(i)     At and from time to time after the Closing, each party will execute and deliver such documents as another party hereto may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

(j)     Commencing on the Closing Date, Seller shall be reasonably available to Purchaser during normal business hours, either in person or via telephone, as reasonably needed

by Purchaser, for no more than the greater of thirty two (32) hours or four (4) days per week, to (i) assist Purchaser in maintaining the Company client base, (ii) coordinate, consummate, and, if necessary, attend introductions between Purchaser and client key contact persons, (iii) directly introduce and assist in fostering a professional relationship between the Purchaser and the Company's largest key clients and the contact persons thereof, and (iv) assist with other tasks related to the transition of control of the Company, as reasonably requested by Purchaser. The Seller shall exert independent control over the aforementioned services. Seller shall be an independent contractor for the Company, and shall not be required to perform any tasks or services that may cause Seller to be deemed an employee of Company. Seller shall have no obligation under this paragraph upon disability or death. Seller, under no circumstances, shall be expected to perform any services later than 2 years beyond the Closing Date. Seller makes no representations or warranties with respect to the services under this paragraph. Seller is providing these services gratuitously, and Seller's failure to adequately perform its obligations herein shall not be a breach of this Agreement or entitle the Purchaser or Company to any remedies whatsoever.

(k)     Notwithstanding anything to the contrary herein, to the extent third party approval or consent is required for any reason, Seller and Purchaser shall work cooperatively in good faith to obtain such third party approval; if the parties are unable to obtain such consent after good faith efforts, it shall not be a breach or failure of any condition of this Agreement, and Seller shall assign to Purchaser or Company, to the extent possible, any benefit derived from such Material Contract.

8.     <u>Conditions to Obligation of the Purchaser</u>. In addition to the other requirements set forth herein, the obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any or all of which may be waived in writing by the Purchaser, in whole or in part:

(a)     The representations and warranties of the Seller and the Company contained in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date (except for any representation or warranty made or given as of a specified date, which shall be true and correct as of such date);

(b)     The Seller and the Company shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     The Seller and the Company shall have executed and delivered all Transaction Documents, to the extent applicable;

(d)     The Company shall have obtained and delivered to the Purchaser all necessary consents to assign the Company's executory contracts, if and to the extent that such consents are necessary to consummate the transactions herein, subject to Section 7(k);

(e)     The execution and delivery of the Lease Agreement and any Landlord consent to Sublease; and

(f)     The execution and delivery of the Real Property Purchase Agreement, and all closing conditions of such document having been met.

9.     <u>Conditions to Obligation of the Seller</u>.  In addition to the other requirements set forth herein, the obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any or all of which may be waived in writing by the Seller, in whole or in part:

(a)     The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date (except for any representation or warranty made or given as of a specified date, which shall be true and correct as of such date);

(b)     The Purchaser shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by him on or prior to the Closing Date;

(c)     The Seller shall have received a certificate from the Purchaser (the "<u>Purchaser's Certificate</u>"), dated as of the Closing Date, signed by the Purchaser, certifying that the conditions specified in Sections 9(a) and 9(b) have been fulfilled;

(d)     The Purchaser shall have executed and delivered all Transaction Documents, to the extent applicable;

(e)     No third party shall have commenced any legal action or proceeding seeking to restrain, prohibit, or invalidate the consummation of the transactions contemplated hereby, no law shall have been enacted or promulgated that would have any such effect, and there shall have been no order or preliminary or permanent injunction entered in any action or proceeding before any Governmental Authority making illegal the consummation of any of the transactions hereunder; and

(f)     The execution and delivery of the Real Property Purchase Agreement, and all closing conditions of such document having been met.

10.     <u>Survival</u>.  The obligations, representations, and warranties made by the parties in Sections 4, 5, 6, 11, and 13 of this Agreement shall survive the Closing, but shall otherwise terminate with this Agreement if no Closing occurs.

11.     <u>Indemnification</u>.

(a)     Indemnification by Seller.  From and after the Closing Date, Seller agrees to indemnify, defend and hold harmless the Purchaser and its officers, directors, shareholders, representatives, successors, assigns, attorneys and agents (each "Purchaser Indemnitee") from

14

and against, and to pay for as incurred, any and all losses, liabilities, damages or deficiencies (including, without limitation, interest, penalties, reasonable costs of defense and investigation, and reasonable attorneys' fees) (collectively, "Losses") incurred by a Purchaser Indemnitee arising out of or due to (i) a material breach of any of the representations, warranties or covenants of Seller contained in this Agreement, (ii) a material breach of any of the representations, warranties, or covenants of the Company to the Purchaser contained in this Agreement to the extent arising from events prior to Closing, and (iii) any claim, cause of action, or suit with respect to or arising from the operation of the Company's business prior to the Closing Date.

(b)      Indemnification by Purchaser.  Purchaser hereby agrees to indemnify, defend and hold harmless the Seller, its officers, directors, representatives, successors, assigns, attorneys and agents (each a "Seller Indemnitee") from and against, and to pay for as incurred, any and all Losses incurred by a Seller Indemnitee arising out of or due to (i) a breach of any of the representations, warranties or covenants of the Purchaser contained in this Agreement, and (ii) any claim, cause of action, or suit with respect to or arising from the operation of the Company's business on and/or after the Closing Date.

(c)      Time Limitation on Indemnification.  The foregoing indemnification shall survive until the expiration of the applicable statutes of limitation.

(d)      All Losses to which an Indemnified Party may be entitled under this Section 11 shall be reduced by the aggregate amount of insurance, warranty, or other indemnity payments such Person actually receives based upon the facts or circumstances upon which such Person's indemnification claim under this Section 11 is based, in whole or in part, and such Indemnified Party shall use all commercially reasonable efforts to seek and obtain any insurance, warranty, or other indemnity payments such Person has reason to believe may be payable based upon such facts or circumstances.

(e)      Each Indemnified Party shall take commercially reasonable steps to mitigate its Losses after obtaining Knowledge of any event which could reasonably be expected to give rise to any Losses.

(f)      In the event Seller is required to indemnify Purchaser for any amount pursuant to its indemnity obligations herein, the Purchaser shall have the right to instead elect to offset and reduce such amount from the amounts due and payable by Purchaser under the Promissory Notes. Purchaser's right to elect for such offset shall terminate 6 calendar months following the Closing.

12.   Termination.

(a)      This Agreement may be terminated at any time prior to the Closing Date:

(i)      by the Purchaser, upon written notice of termination to the Seller at any time prior to the Closing, if (A) the Seller or the Company have breached any material

representation, warranty or covenant contained in this Agreement, the Purchaser has notified the Seller of the breach, and, if of a type which can be cured, the breach has continued without cure for a period of five (5) days after the notice of breach, or (B) the Closing shall not have occurred on or before October 1, 2019 (the "Outside Closing Date") by reason of the failure of any condition precedent under Section 8 (unless the failure results primarily from the Purchaser's breaching any representation, warranty or covenant contained in this Agreement);

(ii)    by the Seller, upon written notice of termination to the Purchaser at any time prior to the Closing, if (A) the Purchaser has breached any material representation, warranty or covenant contained in this Agreement, the Seller has notified the Purchaser of the breach, and, if of a type which can be cured, the breach has continued without cure for a period of five (5) days after the notice of breach, or (B) the Closing shall not have occurred on or before the Outside Closing Date by reason of the failure of any condition precedent under Section 9 (unless the failure results primarily from the Seller breaching any representation, warranty or covenant contained in this Agreement); or

(iii)    by written agreement of the Seller and the Purchaser.

(b)    If this Agreement is terminated pursuant to Section 12(a), then all rights and obligations of the parties hereunder shall terminate without any liability of any party, and the deposit returned to Purchaser, except that in the event of a termination pursuant to Section 12(a)(ii)(A) or 12(a)(ii)(B) due to any bad-faith or negligent actions or omissions of Purchaser, Seller shall be entitled to keep any deposit received from Purchaser; provided, however, Section 13 and the Confidentiality Agreement shall survive any such termination, and the Purchaser shall destroy, or at Seller's written request, return to the Company all documents and other material received from the Seller or the Company, whether so obtained before or after the date hereof; and provided, further, nothing herein shall relieve any party from liability for any willful breach of this Agreement prior to such termination.

13.    Miscellaneous.

(a)    This Agreement and the Transaction Documents constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior negotiations, understandings and agreements, written or oral, between the parties with respect to such subject matter.

(b)    No amendment, modification, alteration, waiver, or course of dealing between the parties shall be effective to alter the terms of this Agreement, unless effected in writing and signed by the parties hereto.

(c)    This Agreement may not be assigned or transferred by any party hereto without the express written consent of the other parties.  Any purported assignment or transfer in violation hereof shall be null and void and of no force and effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrator, personal representatives, successors and permitted assigns.

(d)     Any notice, consent or other communication required or permitted hereunder shall be in writing and shall be deemed given when personally delivered, one business day after being sent by overnight courier (providing proof of delivery) specifying next business day delivery, or three (3) days after mailing if sent by U.S. certified mail, return receipt requested, to the party to whom it is addressed at the address first set forth above or such other address as such party shall specify by notice sent in the manner provided herein.   Notice may also be made via email between the parties' attorneys, which notice shall be effective upon acknowledgment of receipt by the recipient.

(e)     It is the desire and intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.   Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.   Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(f)     This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.   The parties hereby irrevocably (i) submit to the jurisdiction of any state court of competent jurisdiction sitting in the State of New York, County of Nassau and to the federal courts for the Eastern District of New York in any action or proceeding arising out of or relating to this Agreement, (ii) agree that all claims with respect to such action or proceeding shall be heard and determined in such a state or federal court, and (iii) waive, to the fullest extent possible, and agree not to assert, as a defense in any such action or proceeding that such action or proceeding may not be brought or is not maintainable in said court, that the venue thereof may not be appropriate or is inconvenient, or that this Agreement may not be enforced in or by said court.   The parties hereby consent to and grant such court jurisdiction over the persons of such parties and over the subject matter of any such dispute, and agree that delivery or mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 13(d) hereof or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

(g)     All headings set forth in this Agreement are intended for convenience only and shall not control or affect the meaning, construction or effect of this Agreement or of any of the provisions thereof.

(h)     This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors, estates, heirs, personal representatives, and permitted assigns.

(i)  The prevailing party in any suit or action brought against any other party to enforce the terms of this Agreement or any rights or obligations hereunder shall be entitled to receive reimbursement of its costs, expenses and reasonable attorneys' fees and disbursements, including the costs and expenses of experts, actually incurred in connection with such suit or action.

(j)  Except as specifically provided otherwise in this Agreement, each party shall bear all of the fees and expenses incurred by such party in connection with the negotiation, execution and performance of this Agreement and the Transaction Documents, and such party's compliance herewith and therewith, whether or not the transactions contemplated hereby or thereby shall be consummated.

(k)  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.  For purposes hereof, facsimile copies hereof and facsimile signatures hereof shall be authorized and deemed effective.

14.  <u>Definitions</u>.

"<u>Affiliate</u>" means, with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.  As used herein, the term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Financial Statements</u>" means the Company's profit / loss statement provided to Purchaser through 2018, a copy of which is attached hereto as <u>Exhibit D</u>.

"<u>Governmental Authority</u>" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"<u>Knowledge</u>" means (i) with respect to the Seller or the Company, the actual (not constructive or imputed) knowledge of the Seller, and (ii) with respect to the Purchaser, the actual (not constructive or imputed) knowledge of the Purchaser.

"<u>Lien</u>" means any lien, pledge, mortgage, security interest, encumbrance, charge, claim, lease right, or easement.

"<u>Material Adverse Effect</u>" is a meaningful, material and significant restriction on (a) Purchaser's right to operate the business after the Closing Date in a substantially similar manner to the manner Seller operated the business prior to the Closing Date or (b) the ability of Seller or the Company to consummate the transactions contemplated by this Agreement.

"Permitted Liens" means (i) Liens for taxes which are not due and payable as of the Closing Date or are being contested in good faith by appropriate proceedings (provided that no such Lien would have a Material Adverse Effect); (ii) Liens for mechanics, materialmen, laborers, employees, suppliers, or other Liens arising by operation of law for sums which are not due and payable as of the Closing Date or are being contested in good faith by appropriate proceedings (provided that no such Lien would have a Material Adverse Effect); (iii) pledges, deposits or other Liens securing the performance of bids, trade contracts, leases or statutory obligations (including workers' compensation, unemployment insurance or other social security legislation); (iv) Liens created in the ordinary course of business in connection with the leasing, licensing, or financing of equipment, supplies or other assets; and (vi) as to Leased Premises, the ownership and reversion rights of the owner.

"Person" means any individual, corporation, corporation, partnership, firm, joint venture, association, trust, unincorporated organization, governmental authority or other entity.

"Transaction Documents" means the Promissory Notes, Lease Agreement, Real Property Purchase Agreement, Consignment Agreement, and any or all agreements, instruments or documents required or expressly provided under this Agreement to be executed and delivered in connection with the transactions contemplated by this Agreement.

15.     Restrictive Covenants: Non-Compete; Non-Solicitation

(a)     Seller hereby acknowledges that (i) the Seller conducts its business and marketing operations in the general area of the current location of the Company, and (ii) to protect adequately the interest of the Purchaser in the Company and goodwill of the Seller and/or Company, it is essential that any Non-Competition covenant with respect thereto cover the Seller's like business operations in this general area as specified herein. In consideration of the Purchase Price, and any additional consideration due to Seller hereunder, as well as other valuable consideration receipt of which is hereby acknowledged, and recognizing the following:

(b)     Non-Compete. For the consideration specified in this Agreement and in recognition that the covenants by the parties in the Agreement are a material inducement to the Purchaser to enter into and perform this Agreement, Seller agrees that effective upon execution of this Agreement, and without further action on the part of any party or any other person, Seller covenants and agrees that for a period of three (3)  years from the date of the Closing, Seller will not, other than as contemplated by this Agreement and the transaction contemplated therein, represent, engage in, carry on, or have a financial interest in, directly or indirectly, individually, as a member of a partnership or limited liability company, equity owner, shareholder (other than a shareholder of less than one percent of the issued and outstanding stock of a publicly held company whose gross assets exceed USD 100 Million), investor, owner, officer, director, trustee, manager, employee, agent, associate, consultant or contractor, any business that provides products and services provided by the Company within the City of New York, Westchester County, Nassau County or Suffolk County.  The foregoing restrictions shall not apply to ownership of the following trademarks:

a.    "Kolstein's" whose USPTO Registration Number is 4442882.
b.    "Liandro DiVacenza" whose USPTO Registration Number is 5180211.
c.    "Wiedoeft" whose USPTO Registration Number is 5504232.

(c)     Non-Solicitation.  For the consideration specified in this Agreement and in recognition that the covenants by Seller in this Section are a material inducement to the Purchaser to enter into and perform this Agreement, Seller agrees that effective upon execution of this Agreement, and without further action on the part of any party or any other person, Seller covenants and agrees that for a period of five (5)  years from the date of the Closing, Seller will not in any manner, directly or indirectly as an employee, officer, director, investor or consultant of any other person or entity or otherwise by assisting others, solicit, attempt to solicit or engage, on behalf of himself or any other person, firm or entity, any employee of the Company or any current or former customer of the Company.

(d)     Seller agrees that the limitations set forth herein on Seller's rights to compete with the Purchaser or solicit customers are reasonable and necessary for the protection of the Purchaser.  In this regard, Seller specifically agrees that the limitations as to period of time and geographic area, as well as other restrictions on Seller's activities specified herein, are reasonable and necessary for the protection of the Purchaser.  Seller agrees that, in the event that the provisions of this Section should ever be deemed to exceed the scope of the business, time or geographic limitations permitted by applicable law, such provisions shall be and hereby are reformed to the maximum scope of business, time or geographic limitations permitted by applicable law.  Seller agrees that the remedy at law for any breach by Seller of this Section will be inadequate and that the Purchaser shall be entitled to seek injunctive relief.

(e)     Notwithstanding the foregoing, nothing contained in this Section shall preclude Seller from being employed by the Company, nor shall Seller be prohibited from providing consulting services to Connolly Music Company, Inc. located in Northport, New York, or its affiliates, to the extent such consultation does not otherwise violate this Agreement

[signatures follow on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
Barrie Kolstein

_____
Manny Alvarez


**Kolstein Music, Inc.**

By: _____
     Barrie Kolstein, President

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____

Barrie Kolstein

_____

Manny Alvarez

**Kolstein Music, Inc.**

By:_____

Barrie Kolstein, President

COMPOSITE EXHIBIT "B"

# SECURED PROMISSORY NOTE

## August 7, 2019

Manny Alvarez, an individual residing in the State of New York (the "Maker"), promises to pay to the order of Barrie Kolstein, an individual residing in the State of New York, (the "Payee"), and any subsequent holder of this Note (the "Holders"), each as their interests appear, the sum of Two Hundred Thousand Dollars ($200,000.00), plus two and seventy-five hundredths percent (2.75%) interest per annum, compounded monthly to be paid in sixty (60) monthly installments in accordance with the attached Amortization Schedule, except that such payments shall commence on September 1, 2019, and continue on the first of each calendar month until August 1, 2024. Each of the foregoing payment dates are referred to in this Note as the "Due Dates".

So long as the Payee is the sole Holder of the Note, and until the Maker is otherwise directed in writing by Notice as set forth herein, each payment may be paid in full to the order of Barrie Kolstein, or to his estate, as the case may be. The term Holder or Note Holder shall mean the Payees and their assigns or successors in interest.

1. **Default.** The payments due hereunder are due on or before each Due Date. Upon the fifth (5th) day after any such Due Date, if the Maker has not delivered the full required payment due on that Due Date, Maker shall be in "Default" of this Note. No notice or other instrument need be delivered to Maker or any Guarantor in the event of late payment or default in order for a Default to be deemed to have occurred.

Any of the following additional acts shall be deemed a Default by the Maker under this Note, whether or not the payments due hereunder have been timely paid: if Maker shall (i) apply for or consent to the appointment of, or the taking of possession by, any receiver, custodian, trustee or liquidator (or other similar official) of any substantial portion of Maker's property, or (ii) make a general assignment for the benefit of its creditors, or (iii) file a petition commencing a voluntary case under or seeking to take advantage of any bankruptcy law, or (iv) fail to controvert in a timely and appropriate manner, or in writing acquiesce in, any petition commencing an involuntary case against Maker or otherwise filed against Maker pursuant to any bankruptcy law.

2. **Acceleration at Holder's Option.** Any Default by the Maker, no matter the grounds, shall constitute a Default as to the entirety of this Note. In the event of such Default, the entire principal sum remaining unpaid under this Note shall, at the written election of the Holder, become immediately due and payable. Maker may cure any default prior to the effective date of such written election, if Holder receives and accepts payment. Once the full principal sum becomes due in accordance with this Section 2, the due balance shall be subject to the lower of 16% annual interest, or the highest interest amount permitted by law.

3. **Waiver of Presentation, Notice and Protest**. Presentment for payment, notice of dishonor protest and notice of protest are hereby waived by the Maker.

4.     **Waiver of Collection**.  Maker expressly waives the right to require any action by the Holder to collect amounts called for under this Note, and in the handling of any collateral at any time existing in connection with this Note; and acknowledge liability for payment of all sums owing and to be owing on this Note, regardless of any act, or omission to act, with respect to the collection of any property which existed or exists as security for any amount called for under this Note.

5.     **Collection Costs, including Legal Fees, Paid by Maker and Guarantors on Default**. If the Maker shall Default in payment of this Note, and the Note shall thereafter be put in the hands of a collection agent or an attorney at law for collection, the Maker agrees to pay the costs of collection of all amounts due hereunder, including reasonable attorney's fees and legal and other expenses in addition to the principal indebtedness.

6.     **Voluntary Prepayment**.  The Maker shall have the optional right to make prepayments of principal only.  Any prepayment shall be applied to the last payments due and shall not postpone, defer or delay the due date of any subsequent monthly installment.

7.     **Late Charges**.  No late charges shall apply to any installment due to be paid under the terms and conditions of this Note, as lateness constitutes a Default upon election by the Holder.

8.     **Collateral Security**.  Maker hereby promises and grants to Payees and any subsequent Holder a security interest and lien in and to all in the all presently existing or hereafter arising, now owned or hereafter acquired property and assets of Kolstein Music Inc. ("Corporation") including, but not limited to, Accounts ("Account" means any right of payment for goods or services in the ordinary course of Payor's business), general intangibles, contract rights, investment property, deposit accounts, inventory, equipment, instruments, chattel paper, documents, records, intellectual property, insurance proceeds, and all books and records pertaining to Accounts and all proceeds and products of the foregoing in any form, shall be collateral security for the payment of this Note ("Collateral"). Further, as Collateral, Maker shall purchase, and maintain for the life of this Note, a life insurance policy, insuring the life of Maker, in the amount of the principal amount of this Note. Maker shall deliver to Holder a collateral assignment of the policy, appointing Holder as the primary beneficiary of the policy. The Collateral shall be security for the payment of this Note in full. Maker and the Corporation, as applicable, hereby authorize the Holder to execute and file a UCC-1 financing statement, or other document necessary to record or authorize such liens, granting to the Payee and any subsequent Holder a security interest in the Collateral and in the event of any Default hereunder, the Payees or any other Holder may seek to enforce its security interest in the Collateral.  Maker shall not damage, destroy, encumber, sell, gift, or otherwise transfer the Collateral without the express written consent of the Holder, except in the ordinary course of business. Breach of this Section 8 shall be a Default of this Note, except that it shall not be a Default for the Maker to fail to obtain and deliver the aforementioned collateral assignment of life insurance unless such failure continues beyond December 31, 2019.

9.     **Governing Law**.     This Note is being executed and delivered in the State of New York, and this Note and the rights and obligations of the parties hereunder shall be governed by and construed and interpreted in accordance with the substantive laws of the State of New York.

2

10.    **Severability**.  If any provision of this Note is deemed void, invalid or unenforceable under applicable law, such provision is and will be deemed to be totally ineffective to that extent, but the remaining provisions shall be deemed unaffected and shall remain in full force and effect.

11.    **Copy of Note as Evidence**.  **THE MAKER HEREBY ACKNOWLEDGES AND AGREES THAT IF THIS NOTE IS LOST OR DESTROYED, A COPY OF THIS NOTE MAY BE INTRODUCED INTO EVIDENCE IN ANY COURT BY THE HOLDER INSTEAD OF THE ORIGINAL TO PROVE THE CONTENTS HEREOF AND SAID PARTES HEREBY IRREVOCABLY WAIVE ANY OBJECTION TO INTRODUCTION INTO EVIDENCE OF SUCH A COPY. MAKER FURTHER ACKNOWLEDGES AND AGREES THAT HOLDER WILL RELY UPON THE WAIVERS AND ACKNOWLEDGMENTS SET FORTH IN THIS NOTE IN MAKING THE LOAN(S) TO THE MAKER EVIDENCED BY THIS NOTE.**

12.    **Commercial Transaction**.  **THE MAKER ACKNOWLEDGES THAT THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION.**

13.    **Jury Trial Waiver**.  **THE MAKER VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING IN RESPECT OF THIS NOTE OR ARISING OUT OF THIS NOTE.**

14.    **Instrument for Payment of Money Only**.  **This Note is an instrument for the payment of money only within the meaning of the New York CPLR.**

15.    **No Waiver by Holder**.      No delay or omission by the Holder to exercise or enforce any of the Holder's powers, rights, privileges, remedies or discretion hereunder shall operate as a waiver of such rights and remedies.  No actual waiver of any event of Default hereunder shall operate as a waiver of any other Event of Default hereunder, or as a continuing waiver. No requirement hereof may be waived except in a written instrument, signed by Holder.  This Note may not be modified except by an instrument in writing executed by the Maker and the Holder hereof.

16.    **Notices**.      All notices, demands, or other communications made pursuant to this Note shall be in writing.  Any notice to the Maker or any Holder shall be deemed effective if mailed by certified mail, postage prepaid, return receipt requested, on the third (3rd) business day after such mailing or if delivered by nationally recognized, overnight air courier, service, on the first business day after delivery to such courier service. Such notice is to be addressed to the following address:

      If to Maker:
           Manny Alvarez
           795 Foxhurst Rd
           Baldwin, NY 11510

      With a copy to:

3

If to Holder:
    Barrie Kolstein
    3000 Montgomery Street
    Wantagh, NY 11793


    with a copy to:
        Robert G. Bruechert, Attorney At Law, P.C.
        140A Broadway
        Amityville, New York 11701
        Attn:   Robert G. Bruechert, Esq.
        Fax:    (631) 691-2600


or at such other address as such party shall have specified by not less than five (5) days prior written notice to the other party.

17.    **Modification**: Maker hereby agrees that the agreements by Maker in this Note cannot be modified, altered or amended, except by an agreement in writing signed by the Holder.  The rights and remedies of the Holder hereof shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any document referred to herein, and under all applicable laws.

    **IN WITNESS WHEREOF**, the parties have duly executed and delivered this Instrument as of the date written at the beginning of this document.

        Manny Alvarez

        By: _____


        Kolstein Music, Inc.

        (with respect to Section 8)

        By: _____

        Name: Manny Alvarez

        Title: President

4

---

## KMI SALE - NOTE 1

Compound Period ......... :  Monthly

Nominal Annual Rate .... :  2.750 %

### CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 08/01/2019 | 200,000.00 | 1 | | |
| 2 | Payment | 09/01/2019 | 3,571.56 | 60 | Monthly | 08/01/2024 |

### AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 08/01/2019 | | | | 200,000.00 |
| 1 | 09/01/2019 | 3,571.56 | 458.33 | 3,113.23 | 196,886.77 |
| 2 | 10/01/2019 | 3,571.56 | 451.20 | 3,120.36 | 193,766.41 |
| 3 | 11/01/2019 | 3,571.56 | 444.05 | 3,127.51 | 190,638.90 |
| 4 | 12/01/2019 | 3,571.56 | 436.88 | 3,134.68 | 187,504.22 |
| 2019 Totals | | 14,286.24 | 1,790.46 | 12,495.78 | |
| 5 | 01/01/2020 | 3,571.56 | 429.70 | 3,141.86 | 184,362.36 |
| 6 | 02/01/2020 | 3,571.56 | 422.50 | 3,149.06 | 181,213.30 |
| 7 | 03/01/2020 | 3,571.56 | 415.28 | 3,156.28 | 178,057.02 |
| 8 | 04/01/2020 | 3,571.56 | 408.05 | 3,163.51 | 174,893.51 |
| 9 | 05/01/2020 | 3,571.56 | 400.80 | 3,170.76 | 171,722.75 |
| 10 | 06/01/2020 | 3,571.56 | 393.53 | 3,178.03 | 168,544.72 |
| 11 | 07/01/2020 | 3,571.56 | 386.25 | 3,185.31 | 165,359.41 |
| 12 | 08/01/2020 | 3,571.56 | 378.95 | 3,192.61 | 162,166.80 |
| 13 | 09/01/2020 | 3,571.56 | 371.63 | 3,199.93 | 158,966.87 |
| 14 | 10/01/2020 | 3,571.56 | 364.30 | 3,207.26 | 155,759.61 |
| 15 | 11/01/2020 | 3,571.56 | 356.95 | 3,214.61 | 152,545.00 |
| 16 | 12/01/2020 | 3,571.56 | 349.58 | 3,221.98 | 149,323.02 |
| 2020 Totals | | 42,858.72 | 4,677.52 | 38,181.20 | |
| 17 | 01/01/2021 | 3,571.56 | 342.20 | 3,229.36 | 146,093.66 |
| 18 | 02/01/2021 | 3,571.56 | 334.80 | 3,236.76 | 142,856.90 |
| 19 | 03/01/2021 | 3,571.56 | 327.38 | 3,244.18 | 139,612.72 |
| 20 | 04/01/2021 | 3,571.56 | 319.95 | 3,251.61 | 136,361.11 |
| 21 | 05/01/2021 | 3,571.56 | 312.49 | 3,259.07 | 133,102.04 |
| 22 | 06/01/2021 | 3,571.56 | 305.03 | 3,266.53 | 129,835.51 |
| 23 | 07/01/2021 | 3,571.56 | 297.54 | 3,274.02 | 126,561.49 |
| 24 | 08/01/2021 | 3,571.56 | 290.04 | 3,281.52 | 123,279.97 |
| 25 | 09/01/2021 | 3,571.56 | 282.52 | 3,289.04 | 119,990.93 |
| 26 | 10/01/2021 | 3,571.56 | 274.98 | 3,296.58 | 116,694.35 |
| 27 | 11/01/2021 | 3,571.56 | 267.42 | 3,304.14 | 113,390.21 |
| 28 | 12/01/2021 | 3,571.56 | 259.85 | 3,311.71 | 110,078.50 |
| 2021 Totals | | 42,858.72 | 3,614.20 | 39,244.52 | |
| 29 | 01/01/2022 | 3,571.56 | 252.26 | 3,319.30 | 106,759.20 |

## KMI SALE - NOTE 1

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 30 | 02/01/2022 | 3,571.56 | 244.66 | 3,326.90 | 103,432.30 |
| 31 | 03/01/2022 | 3,571.56 | 237.03 | 3,334.53 | 100,097.77 |
| 32 | 04/01/2022 | 3,571.56 | 229.39 | 3,342.17 | 96,755.60 |
| 33 | 05/01/2022 | 3,571.56 | 221.73 | 3,349.83 | 93,405.77 |
| 34 | 06/01/2022 | 3,571.56 | 214.05 | 3,357.51 | 90,048.26 |
| 35 | 07/01/2022 | 3,571.56 | 206.36 | 3,365.20 | 86,683.06 |
| 36 | 08/01/2022 | 3,571.56 | 198.65 | 3,372.91 | 83,310.15 |
| 37 | 09/01/2022 | 3,571.56 | 190.92 | 3,380.64 | 79,929.51 |
| 38 | 10/01/2022 | 3,571.56 | 183.17 | 3,388.39 | 76,541.12 |
| 39 | 11/01/2022 | 3,571.56 | 175.41 | 3,396.15 | 73,144.97 |
| 40 | 12/01/2022 | 3,571.56 | 167.62 | 3,403.94 | 69,741.03 |
| 2022 Totals | | 42,858.72 | 2,521.25 | 40,337.47 | |
| | | | | | |
| 41 | 01/01/2023 | 3,571.56 | 159.82 | 3,411.74 | 66,329.29 |
| 42 | 02/01/2023 | 3,571.56 | 152.00 | 3,419.56 | 62,909.73 |
| 43 | 03/01/2023 | 3,571.56 | 144.17 | 3,427.39 | 59,482.34 |
| 44 | 04/01/2023 | 3,571.56 | 136.31 | 3,435.25 | 56,047.09 |
| 45 | 05/01/2023 | 3,571.56 | 128.44 | 3,443.12 | 52,603.97 |
| 46 | 06/01/2023 | 3,571.56 | 120.55 | 3,451.01 | 49,152.96 |
| 47 | 07/01/2023 | 3,571.56 | 112.64 | 3,458.92 | 45,694.04 |
| 48 | 08/01/2023 | 3,571.56 | 104.72 | 3,466.84 | 42,227.20 |
| 49 | 09/01/2023 | 3,571.56 | 96.77 | 3,474.79 | 38,752.41 |
| 50 | 10/01/2023 | 3,571.56 | 88.81 | 3,482.75 | 35,269.66 |
| 51 | 11/01/2023 | 3,571.56 | 80.83 | 3,490.73 | 31,778.93 |
| 52 | 12/01/2023 | 3,571.56 | 72.83 | 3,498.73 | 28,280.20 |
| 2023 Totals | | 42,858.72 | 1,397.89 | 41,460.83 | |
| | | | | | |
| 53 | 01/01/2024 | 3,571.56 | 64.81 | 3,506.75 | 24,773.45 |
| 54 | 02/01/2024 | 3,571.56 | 56.77 | 3,514.79 | 21,258.66 |
| 55 | 03/01/2024 | 3,571.56 | 48.72 | 3,522.84 | 17,735.82 |
| 56 | 04/01/2024 | 3,571.56 | 40.64 | 3,530.92 | 14,204.90 |
| 57 | 05/01/2024 | 3,571.56 | 32.55 | 3,539.01 | 10,665.89 |
| 58 | 06/01/2024 | 3,571.56 | 24.44 | 3,547.12 | 7,118.77 |
| 59 | 07/01/2024 | 3,571.56 | 16.31 | 3,555.25 | 3,563.52 |
| 60 | 08/01/2024 | 3,571.56 | 8.04 | 3,563.52 | 0.00 |
| 2024 Totals | | 28,572.48 | 292.28 | 28,280.20 | |
| | | | | | |
| Grand Totals | | 214,293.60 | 14,293.60 | 200,000.00 | |

KMI SALE - NOTE 1

Last interest amount decreased by 0.13 due to rounding.

# SECURED PROMISSORY NOTE

## August 7, 2019

Manny Alvarez, an individual residing in the State of New York (the "Maker"), promises to pay to the order of Barrie Kolstein, an individual residing in the State of New York, (the "Payee"), and any subsequent holder of this Note (the "Holders"), each as their interests appear, the sum of Seven Hundred Forty Thousand, Eight Hundred Forty and Ninety Eight Hundredths Dollars ($740,840.98), plus Two and Seventy Five Hundredths percent (2.75%) interest per annum, to be paid in one hundred twenty (120) monthly installments in accordance with the attached Amortization Schedule, except that such payments shall commence on September 1, 2019, and continue on the first of each calendar month until August 1, 2029. Each of the foregoing payment dates are referred to in this Note as the "Due Dates".

So long as the Payee is the sole Holder of the Note, and until the Maker is otherwise directed in writing by Notice as set forth herein, each payment may be paid in full to the order of Barrie Kolstein, or to his estate, as the case may be. The term Holder or Note Holder shall mean the Payees and their assigns or successors in interest.

1. **Default.** The payments due hereunder are due on or before each Due Date. Upon the fifth (5th) day after any such Due Date, if the Maker has not delivered the full required payment due on that Due Date, Maker shall be in "Default" of this Note. No notice or other instrument need be delivered to Maker or any Guarantor in the event of late payment or default in order for a Default to be deemed to have occurred.

Any of the following additional acts shall be deemed a Default by the Maker under this Note, whether or not the payments due hereunder have been timely paid: if Maker shall (i) apply for or consent to the appointment of, or the taking of possession by, any receiver, custodian, trustee or liquidator (or other similar official) of any substantial portion of Maker's property, or (ii) make a general assignment for the benefit of its creditors, or (iii) file a petition commencing a voluntary case under or seeking to take advantage of any bankruptcy law, or (iv) fail to controvert in a timely and appropriate manner, or in writing acquiesce in, any petition commencing an involuntary case against Maker or otherwise filed against Maker pursuant to any bankruptcy law.

2. **Acceleration at Holder's Option**. Any Default by the Maker, no matter the grounds, shall constitute a Default as to the entirety of this Note. In the event of such Default, the entire principal sum remaining unpaid under this Note shall, at the written election of the Holder, become immediately due and payable. Maker may cure any default prior to the effective date of such written election, if Holder receives and accepts payment. Once the full principal sum becomes due in accordance with this Section 2, the due balance shall be subject to the lower of 16% annual interest, or the highest interest amount permitted by law.

3. **Waiver of Presentation, Notice and Protest**. Presentment for payment, notice of dishonor protest and notice of protest are hereby waived by the Maker.

4.    **Waiver of Collection**.  Maker expressly waives the right to require any action by the Holder to collect amounts called for under this Note, and in the handling of any collateral at any time existing in connection with this Note; and acknowledge liability for payment of all sums owing and to be owing on this Note, regardless of any act, or omission to act, with respect to the collection of any property which existed or exists as security for any amount called for under this Note.

5.    **Collection Costs, including Legal Fees, Paid by Maker and Guarantors on Default**. If the Maker shall Default in payment of this Note, and the Note shall thereafter be put in the hands of a collection agent or an attorney at law for collection, the Maker agrees to pay the costs of collection of all amounts due hereunder, including reasonable attorney's fees and legal and other expenses in addition to the principal indebtedness.

6.    **Voluntary Prepayment**.  The Maker shall have the optional right to make prepayments; however, all prepayments will be deemed credits toward the last payment(s) due hereunder and shall not otherwise reduce any subsequent amounts due.

7.    **Late Charges**.  No late charges shall apply to any installment due to be paid under the terms and conditions of this Note, as lateness constitutes a Default upon election by the Holder.

8.    **Collateral Security**.  Maker hereby promises and grants to Payees and any subsequent Holder a security interest and lien in and to all in the all presently existing or hereafter arising, now owned or hereafter acquired property and assets of Kolstein Music Inc. ("Corporation") including, but not limited to, Accounts ("Account" means any right of payment for goods or services in the ordinary course of Payor's business), general intangibles, contract rights, investment property, deposit accounts, inventory, equipment, instruments, chattel paper, documents, records, intellectual property, insurance proceeds, and all books and records pertaining to Accounts and all proceeds and products of the foregoing in any form, shall be collateral security for the payment of this Note ("Collateral"). Further, as Collateral, Maker shall purchase, and maintain for the life of this Note, a life insurance policy, insuring the life of Maker, in the amount of the principal amount of this Note. Maker shall deliver to Holder a collateral assignment of the policy, appointing Holder as the primary beneficiary of the policy. The Collateral shall be security for the payment of this Note in full. Maker and the Corporation, as applicable, hereby authorize the Holder to execute and file a UCC-1 financing statement, or other document necessary to record or authorize such liens, granting to the Payee and any subsequent Holder a security interest in the Collateral and in the event of any Default hereunder, the Payees or any other Holder may seek to enforce its security interest in the Collateral. Maker shall not damage, destroy, encumber, sell, gift, or otherwise transfer the Collateral without the express written consent of the Holder, except in the ordinary course of business. Breach of this Section 8 shall be a Default of this Note, except that it shall not be a Default for the Maker to fail to obtain and deliver the aforementioned collateral assignment of life insurance unless such failure continues beyond December 31, 2019.

9.    **Governing Law**.    This Note is being executed and delivered in the State of New York, and this Note and the rights and obligations of the parties hereunder shall be governed by and construed and interpreted in accordance with the substantive laws of the State of New York.

10.    **Severability**.  If any provision of this Note is deemed void, invalid or unenforceable under applicable law, such provision is and will be deemed to be totally ineffective to that extent, but the remaining provisions shall be deemed unaffected and shall remain in full force and effect.

11.    **Copy of Note as Evidence**.  **THE MAKER HEREBY ACKNOWLEDGES AND AGREES THAT IF THIS NOTE IS LOST OR DESTROYED, A COPY OF THIS NOTE MAY BE INTRODUCED INTO EVIDENCE IN ANY COURT BY THE HOLDER INSTEAD OF THE ORIGINAL TO PROVE THE CONTENTS HEREOF AND SAID PARTES HEREBY IRREVOCABLY WAIVE ANY OBJECTION TO INTRODUCTION INTO EVIDENCE OF SUCH A COPY. MAKER FURTHER ACKNOWLEDGES AND AGREES THAT HOLDER WILL RELY UPON THE WAIVERS AND ACKNOWLEDGMENTS SET FORTH IN THIS NOTE IN MAKING THE LOAN(S) TO THE MAKER EVIDENCED BY THIS NOTE.**

12.    **Commercial Transaction**.  **THE MAKER ACKNOWLEDGES THAT THIS NOTE IS PART OF A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION.**

13.    **Jury Trial Waiver**.  **THE MAKER VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING IN RESPECT OF THIS NOTE OR ARISING OUT OF THIS NOTE.**

14.    **Instrument for Payment of Money Only**.  **This Note is an instrument for the payment of money only within the meaning of the New York CPLR.**

15.    **No Waiver by Holder**.        No delay or omission by the Holder to exercise or enforce any of the Holder's powers, rights, privileges, remedies or discretion hereunder shall operate as a waiver of such rights and remedies.  No actual waiver of any event of Default hereunder shall operate as a waiver of any other Event of Default hereunder, or as a continuing waiver. No requirement hereof may be waived except in a written instrument, signed by Holder.  This Note may not be modified except by an instrument in writing executed by the Maker and the Holder hereof.

16.    **Notices**.        All notices, demands, or other communications made pursuant to this Note shall be in writing.  Any notice to the Maker or any Holder shall be deemed effective if mailed by certified mail, postage prepaid, return receipt requested, on the third (3rd) business day after such mailing or if delivered by nationally recognized, overnight air courier, service, on the first business day after delivery to such courier service. Such notice is to be addressed to the following address:

        If to Maker:
            Manny Alvarez
            795 Foxhurst Rd.
            Baldwin, NY 11510

        With a copy to:
            _____

3

If to Holder:
> Barrie Kolstein
> 3000 Montgomery Street
> Wantagh, NY 11793


with a copy to:
> Robert G. Bruechert, Attorney At Law, P.C.
> 140A Broadway
> Amityville, New York 11701
> Attn:   Robert G. Bruechert, Esq.
> Fax:    (631) 691-2600

or at such other address as such party shall have specified by not less than five (5) days prior written notice to the other party.

17.    **Modification**: Maker hereby agrees that the agreements by Maker in this Note cannot be modified, altered or amended, except by an agreement in writing signed by the Holder.   The rights and remedies of the Holder hereof shall be cumulative and not in the alternative, and shall include all rights and remedies granted herein, in any document referred to herein, and under all applicable laws.

**IN WITNESS WHEREOF**, the parties have duly executed and delivered this Instrument as of the date written at the beginning of this document.

Manny Alvarez

By: _____

Kolstein Music, Inc.

(with respect to Section 8)

By: _____

Name: Manny Alvarez

Title: President

4

## KMI SALE - NOTE 2

Compound Period ......... :  Monthly

Nominal Annual Rate .... :  2.750 %

CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 08/01/2019 | 740,840.98 | 1 | | |
| 2 | Payment | 09/01/2019 | 5,000.00 | 6 | Monthly | 02/01/2020 |
| 3 | Payment | 03/01/2020 | 7,192.98 | 114 | Monthly | 08/01/2029 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 08/01/2019 | | | | 740,840.98 |
| 1 | 09/01/2019 | 5,000.00 | 1,697.76 | 3,302.24 | 737,538.74 |
| 2 | 10/01/2019 | 5,000.00 | 1,690.19 | 3,309.81 | 734,228.93 |
| 3 | 11/01/2019 | 5,000.00 | 1,682.61 | 3,317.39 | 730,911.54 |
| 4 | 12/01/2019 | 5,000.00 | 1,675.01 | 3,324.99 | 727,586.55 |
| 2019 Totals | | 20,000.00 | 6,745.57 | 13,254.43 | |
| 5 | 01/01/2020 | 5,000.00 | 1,667.39 | 3,332.61 | 724,253.94 |
| 6 | 02/01/2020 | 5,000.00 | 1,659.75 | 3,340.25 | 720,913.69 |
| 7 | 03/01/2020 | 7,192.98 | 1,652.09 | 5,540.89 | 715,372.80 |
| 8 | 04/01/2020 | 7,192.98 | 1,639.40 | 5,553.58 | 709,819.22 |
| 9 | 05/01/2020 | 7,192.98 | 1,626.67 | 5,566.31 | 704,252.91 |
| 10 | 06/01/2020 | 7,192.98 | 1,613.91 | 5,579.07 | 698,673.84 |
| 11 | 07/01/2020 | 7,192.98 | 1,601.13 | 5,591.85 | 693,081.99 |
| 12 | 08/01/2020 | 7,192.98 | 1,588.31 | 5,604.67 | 687,477.32 |
| 13 | 09/01/2020 | 7,192.98 | 1,575.47 | 5,617.51 | 681,859.81 |
| 14 | 10/01/2020 | 7,192.98 | 1,562.60 | 5,630.38 | 676,229.43 |
| 15 | 11/01/2020 | 7,192.98 | 1,549.69 | 5,643.29 | 670,586.14 |
| 16 | 12/01/2020 | 7,192.98 | 1,536.76 | 5,656.22 | 664,929.92 |
| 2020 Totals | | 81,929.80 | 19,273.17 | 62,656.63 | |
| 17 | 01/01/2021 | 7,192.98 | 1,523.80 | 5,669.18 | 659,260.74 |
| 18 | 02/01/2021 | 7,192.98 | 1,510.81 | 5,682.17 | 653,578.57 |
| 19 | 03/01/2021 | 7,192.98 | 1,497.78 | 5,695.20 | 647,883.37 |
| 20 | 04/01/2021 | 7,192.98 | 1,484.73 | 5,708.25 | 642,175.12 |
| 21 | 05/01/2021 | 7,192.98 | 1,471.65 | 5,721.33 | 636,453.79 |
| 22 | 06/01/2021 | 7,192.98 | 1,458.54 | 5,734.44 | 630,719.35 |
| 23 | 07/01/2021 | 7,192.98 | 1,445.40 | 5,747.58 | 624,971.77 |
| 24 | 08/01/2021 | 7,192.98 | 1,432.23 | 5,760.75 | 619,211.02 |
| 25 | 09/01/2021 | 7,192.98 | 1,419.03 | 5,773.95 | 613,437.07 |
| 26 | 10/01/2021 | 7,192.98 | 1,405.79 | 5,787.19 | 607,649.88 |
| 27 | 11/01/2021 | 7,192.98 | 1,392.53 | 5,800.45 | 601,849.43 |
| 28 | 12/01/2021 | 7,192.98 | 1,379.24 | 5,813.74 | 596,035.69 |
| 2021 Totals | | 86,315.76 | 17,421.53 | 68,894.23 | |

KMI SALE - NOTE 2

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 29 | 01/01/2022 | 7,192.98 | 1,365.92 | 5,827.06 | 590,208.63 |
| 30 | 02/01/2022 | 7,192.98 | 1,352.56 | 5,840.42 | 584,368.21 |
| 31 | 03/01/2022 | 7,192.98 | 1,339.18 | 5,853.80 | 578,514.41 |
| 32 | 04/01/2022 | 7,192.98 | 1,325.76 | 5,867.22 | 572,647.19 |
| 33 | 05/01/2022 | 7,192.98 | 1,312.32 | 5,880.66 | 566,766.53 |
| 34 | 06/01/2022 | 7,192.98 | 1,298.84 | 5,894.14 | 560,872.39 |
| 35 | 07/01/2022 | 7,192.98 | 1,285.33 | 5,907.65 | 554,964.74 |
| 36 | 08/01/2022 | 7,192.98 | 1,271.79 | 5,921.19 | 549,043.55 |
| 37 | 09/01/2022 | 7,192.98 | 1,258.22 | 5,934.76 | 543,108.79 |
| 38 | 10/01/2022 | 7,192.98 | 1,244.62 | 5,948.36 | 537,160.43 |
| 39 | 11/01/2022 | 7,192.98 | 1,230.99 | 5,961.99 | 531,198.44 |
| 40 | 12/01/2022 | 7,192.98 | 1,217.33 | 5,975.65 | 525,222.79 |
| 2022 Totals | | 86,315.76 | 15,502.86 | 70,812.90 | |
| 41 | 01/01/2023 | 7,192.98 | 1,203.64 | 5,989.34 | 519,233.45 |
| 42 | 02/01/2023 | 7,192.98 | 1,189.91 | 6,003.07 | 513,230.38 |
| 43 | 03/01/2023 | 7,192.98 | 1,176.15 | 6,016.83 | 507,213.55 |
| 44 | 04/01/2023 | 7,192.98 | 1,162.36 | 6,030.62 | 501,182.93 |
| 45 | 05/01/2023 | 7,192.98 | 1,148.54 | 6,044.44 | 495,138.49 |
| 46 | 06/01/2023 | 7,192.98 | 1,134.69 | 6,058.29 | 489,080.20 |
| 47 | 07/01/2023 | 7,192.98 | 1,120.81 | 6,072.17 | 483,008.03 |
| 48 | 08/01/2023 | 7,192.98 | 1,106.89 | 6,086.09 | 476,921.94 |
| 49 | 09/01/2023 | 7,192.98 | 1,092.95 | 6,100.03 | 470,821.91 |
| 50 | 10/01/2023 | 7,192.98 | 1,078.97 | 6,114.01 | 464,707.90 |
| 51 | 11/01/2023 | 7,192.98 | 1,064.96 | 6,128.02 | 458,579.88 |
| 52 | 12/01/2023 | 7,192.98 | 1,050.91 | 6,142.07 | 452,437.81 |
| 2023 Totals | | 86,315.76 | 13,530.78 | 72,784.98 | |
| 53 | 01/01/2024 | 7,192.98 | 1,036.84 | 6,156.14 | 446,281.67 |
| 54 | 02/01/2024 | 7,192.98 | 1,022.73 | 6,170.25 | 440,111.42 |
| 55 | 03/01/2024 | 7,192.98 | 1,008.59 | 6,184.39 | 433,927.03 |
| 56 | 04/01/2024 | 7,192.98 | 994.42 | 6,198.56 | 427,728.47 |
| 57 | 05/01/2024 | 7,192.98 | 980.21 | 6,212.77 | 421,515.70 |
| 58 | 06/01/2024 | 7,192.98 | 965.97 | 6,227.01 | 415,288.69 |
| 59 | 07/01/2024 | 7,192.98 | 951.70 | 6,241.28 | 409,047.41 |
| 60 | 08/01/2024 | 7,192.98 | 937.40 | 6,255.58 | 402,791.83 |
| 61 | 09/01/2024 | 7,192.98 | 923.06 | 6,269.92 | 396,521.91 |
| 62 | 10/01/2024 | 7,192.98 | 908.70 | 6,284.28 | 390,237.63 |
| 63 | 11/01/2024 | 7,192.98 | 894.29 | 6,298.69 | 383,938.94 |
| 64 | 12/01/2024 | 7,192.98 | 879.86 | 6,313.12 | 377,625.82 |
| 2024 Totals | | 86,315.76 | 11,503.77 | 74,811.99 | |
| 65 | 01/01/2025 | 7,192.98 | 865.39 | 6,327.59 | 371,298.23 |
| 66 | 02/01/2025 | 7,192.98 | 850.89 | 6,342.09 | 364,956.14 |
| 67 | 03/01/2025 | 7,192.98 | 836.36 | 6,356.62 | 358,599.52 |
| 68 | 04/01/2025 | 7,192.98 | 821.79 | 6,371.19 | 352,228.33 |
| 69 | 05/01/2025 | 7,192.98 | 807.19 | 6,385.79 | 345,842.54 |
| 70 | 06/01/2025 | 7,192.98 | 792.56 | 6,400.42 | 339,442.12 |
| 71 | 07/01/2025 | 7,192.98 | 777.89 | 6,415.09 | 333,027.03 |

KMI SALE - NOTE 2

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 72 | 08/01/2025 | 7,192.98 | 763.19 | 6,429.79 | 326,597.24 |
| 73 | 09/01/2025 | 7,192.98 | 748.45 | 6,444.53 | 320,152.71 |
| 74 | 10/01/2025 | 7,192.98 | 733.68 | 6,459.30 | 313,693.41 |
| 75 | 11/01/2025 | 7,192.98 | 718.88 | 6,474.10 | 307,219.31 |
| 76 | 12/01/2025 | 7,192.98 | 704.04 | 6,488.94 | 300,730.37 |
| 2025 Totals | | 86,315.76 | 9,420.31 | 76,895.45 | |
| | | | | | |
| 77 | 01/01/2026 | 7,192.98 | 689.17 | 6,503.81 | 294,226.56 |
| 78 | 02/01/2026 | 7,192.98 | 674.27 | 6,518.71 | 287,707.85 |
| 79 | 03/01/2026 | 7,192.98 | 659.33 | 6,533.65 | 281,174.20 |
| 80 | 04/01/2026 | 7,192.98 | 644.36 | 6,548.62 | 274,625.58 |
| 81 | 05/01/2026 | 7,192.98 | 629.35 | 6,563.63 | 268,061.95 |
| 82 | 06/01/2026 | 7,192.98 | 614.31 | 6,578.67 | 261,483.28 |
| 83 | 07/01/2026 | 7,192.98 | 599.23 | 6,593.75 | 254,889.53 |
| 84 | 08/01/2026 | 7,192.98 | 584.12 | 6,608.86 | 248,280.67 |
| 85 | 09/01/2026 | 7,192.98 | 568.98 | 6,624.00 | 241,656.67 |
| 86 | 10/01/2026 | 7,192.98 | 553.80 | 6,639.18 | 235,017.49 |
| 87 | 11/01/2026 | 7,192.98 | 538.58 | 6,654.40 | 228,363.09 |
| 88 | 12/01/2026 | 7,192.98 | 523.33 | 6,669.65 | 221,693.44 |
| 2026 Totals | | 86,315.76 | 7,278.83 | 79,036.93 | |
| | | | | | |
| 89 | 01/01/2027 | 7,192.98 | 508.05 | 6,684.93 | 215,008.51 |
| 90 | 02/01/2027 | 7,192.98 | 492.73 | 6,700.25 | 208,308.26 |
| 91 | 03/01/2027 | 7,192.98 | 477.37 | 6,715.61 | 201,592.65 |
| 92 | 04/01/2027 | 7,192.98 | 461.98 | 6,731.00 | 194,861.65 |
| 93 | 05/01/2027 | 7,192.98 | 446.56 | 6,746.42 | 188,115.23 |
| 94 | 06/01/2027 | 7,192.98 | 431.10 | 6,761.88 | 181,353.35 |
| 95 | 07/01/2027 | 7,192.98 | 415.60 | 6,777.38 | 174,575.97 |
| 96 | 08/01/2027 | 7,192.98 | 400.07 | 6,792.91 | 167,783.06 |
| 97 | 09/01/2027 | 7,192.98 | 384.50 | 6,808.48 | 160,974.58 |
| 98 | 10/01/2027 | 7,192.98 | 368.90 | 6,824.08 | 154,150.50 |
| 99 | 11/01/2027 | 7,192.98 | 353.26 | 6,839.72 | 147,310.78 |
| 100 | 12/01/2027 | 7,192.98 | 337.59 | 6,855.39 | 140,455.39 |
| 2027 Totals | | 86,315.76 | 5,077.71 | 81,238.05 | |
| | | | | | |
| 101 | 01/01/2028 | 7,192.98 | 321.88 | 6,871.10 | 133,584.29 |
| 102 | 02/01/2028 | 7,192.98 | 306.13 | 6,886.85 | 126,697.44 |
| 103 | 03/01/2028 | 7,192.98 | 290.35 | 6,902.63 | 119,794.81 |
| 104 | 04/01/2028 | 7,192.98 | 274.53 | 6,918.45 | 112,876.36 |
| 105 | 05/01/2028 | 7,192.98 | 258.67 | 6,934.31 | 105,942.05 |
| 106 | 06/01/2028 | 7,192.98 | 242.78 | 6,950.20 | 98,991.85 |
| 107 | 07/01/2028 | 7,192.98 | 226.86 | 6,966.12 | 92,025.73 |
| 108 | 08/01/2028 | 7,192.98 | 210.89 | 6,982.09 | 85,043.64 |
| 109 | 09/01/2028 | 7,192.98 | 194.89 | 6,998.09 | 78,045.55 |
| 110 | 10/01/2028 | 7,192.98 | 178.85 | 7,014.13 | 71,031.42 |
| 111 | 11/01/2028 | 7,192.98 | 162.78 | 7,030.20 | 64,001.22 |
| 112 | 12/01/2028 | 7,192.98 | 146.67 | 7,046.31 | 56,954.91 |
| 2028 Totals | | 86,315.76 | 2,815.28 | 83,500.48 | |

## KMI SALE - NOTE 2

|  | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 113 | 01/01/2029 | 7,192.98 | 130.52 | 7,062.46 | 49,892.45 |
| 114 | 02/01/2029 | 7,192.98 | 114.34 | 7,078.64 | 42,813.81 |
| 115 | 03/01/2029 | 7,192.98 | 98.11 | 7,094.87 | 35,718.94 |
| 116 | 04/01/2029 | 7,192.98 | 81.86 | 7,111.12 | 28,607.82 |
| 117 | 05/01/2029 | 7,192.98 | 65.56 | 7,127.42 | 21,480.40 |
| 118 | 06/01/2029 | 7,192.98 | 49.23 | 7,143.75 | 14,336.65 |
| 119 | 07/01/2029 | 7,192.98 | 32.85 | 7,160.13 | 7,176.52 |
| 120 | 08/01/2029 | 7,192.98 | 16.46 | 7,176.52 | 0.00 |
| 2029 Totals | | 57,543.84 | 588.93 | 56,954.91 | |
| Grand Totals | | 849,999.72 | 109,158.74 | 740,840.98 | |

KMI SALE - NOTE 2

Last interest amount increased by 0.01 due to rounding.

EXHIBIT "C"

Wanhao Xu



Hi Wan.. Here is a quick playing clip.. I am really impressed with the power and depth that this smaller Tarantino possesses.  It is a power house.  Dimension are Overall Body Length 40 1/8"-102cm. Width across the upper bout ..18 1/2" …. 47cm.   Width across the center bout…4" ….. 35.5cm.  Width across the lower bout…23 1/4" ….59cm, Mensure (string length) 40 1/4" ….102.3 cm. Rib depth is about 6 3/4" ….16.2cm

This is a great and affordable Italian bass.  I have sold the conventional sized Tarantino basses for $58,000.. there is a smaller market in the US for these rarer smaller sized Tarantino basses.  This is only the second on I have owned, but I really like them.  The bass is on the web at $48000, but I can remove the price .. with my acquisition of this bass and the restoration I did in the bass, I would need to net $40,000.. I am sure this could be sold for more than $48k in Korea. If Robertson's had this bass they would likely sell it for $60 to 70 k or more.

I can deal with you on this bass directly if that works.

I will cut the shop in privately for their commission.

I will send you dimensions on the testore copy later

AUG 21 AT 7:08 PM

COMPOSITE EXHIBIT "D"

Phone: (516) 849-2336

# Kolstein Associates Ltd.

## 3000 Montgomery Street
## Wantagh, N.Y. 11793 USA

International Society of Bassists                    February 19, 2025
14070 Proton Rd., Suite 100
Dallas , TX  75244

To Whom It May Concern:

The 3/4 size, violin cornered, flat back model Bass Violin, property of the International Society of Bassists, and on extended loan to the Jerusalem Academy of Music and Dance,  is the work of Barrie Kolstein, circa 2024, and is a copy of Carlo Giuseppe Testore, made in New York. The Bass is so labeled within.  This bass Violin is was donated by Mr. Kolstein to the International Society of Bassists.

Description:

The top table is a two piece plate of slab cut fir with an ebonized border running the entire perimeter of the table.

The back table is a two piece plate of Willow cut on the slab.

The ribs are of matching character willow to that of the back table.

The scroll and neck are both original of slightly figured poplar.

 The gears are individual antiqued brass Baker style tuners.

The varnish is a deep brown color with reddish amber hues, most antiqued in nature.

The Bass is equipped with a Low C-String Extension with 4 closure capos.

The bass is in excellent condition.

Principal Dimensions:
Overall Body Length: 43-1/4"
Widths Across the Upper Top Bout: 17-7/8"
With Across the Center Bout: 12-3/4"
Width Across the Lower Bout: 24"

Said Bass Violin has an appraised value in today's market:
Forty One  Thousand  Dollars ($41,000.00)

One  Kolstein Registered German Model Bass Bow made of Pernambuco stick, ebony Frog, ebony turn button, mammoth tip, made in 1994 in New York by Mr Kolstein, also donated to the International Society of Bassists.
This bow has an appraised value in todays market of:
Eight Thousand Dollars ($8000.00)

Total Insured value for said Bass Violin and Bow is $49,000.00 with The International Society of Bassists as the sole beneficiary of this insurance policy.

*Barrie Kolstein* (signature)

**Barrie Kolstein**

| Form **8283** | **Noncash Charitable Contributions** | OMB No. 1545-0908 |
|---|---|---|
| (Rev. December 2006)<br>Department of the Treasury<br>Internal Revenue Service | ▶ Attach to your tax return if you claimed a total deduction<br>of over $500 for all contributed property.<br>▶ See separate instructions. | Attachment<br>Sequence No. **155** |

| Name(s) shown on your income tax return | Identifying number |
|---|---|
| Barrie Kolstein | |

**Note.** Figure the amount of your contribution deduction before completing this form. See your tax return instructions.

**Section A. Donated Property of $5,000 or Less and Certain Publicly Traded Securities**—List in this section **only** items (or groups of similar items) for which you claimed a deduction of $5,000 or less. Also, list certain publicly traded securities even if the deduction is more than $5,000 (see instructions).

| Part I | Information on Donated Property—If you need more space, attach a statement. |
|---|---|

| 1 | (a) Name and address of the donee organization | (b) Description of donated property<br>(For a donated vehicle, enter the year, make, model, condition, and mileage, and attach Form 1098-C if required.) |
|---|---|---|
| A | International Society of Bassists<br>14070 Proton Rd. Suite 100, Dallas, Texas 75244 | Kolstein Testore Model Bass Violin with Low C string Extension and Padded cover |
| B | International Society of Bassists<br>14070 Proton Rd. Suite 100, Dallas, Texas. 75244 | Kolstein Registered German Bass Bow |
| C | | |
| D | | |
| E | | |

**Note.** If the amount you claimed as a deduction for an item is $500 or less, you do not have to complete columns (d), (e), and (f).

| | (c) Date of the contribution | (d) Date acquired by donor (mo., yr.) | (e) How acquired by donor | (f) Donor's cost or adjusted basis | (g) Fair market value (see instructions) | (h) Method used to determine the fair market value |
|---|---|---|---|---|---|---|
| A | 02/21/2025 | 05/14/2024 | Built by Donor | $8000 | $41,000 | Appraisal |
| B | 02/21/2025 | 07/02/2019 | Built by Donor | $1200 | $8000 | Appraisal |
| C | | | | | | |
| D | | | | | | |
| E | | | | | | |

| Part II | Partial Interests and Restricted Use Property—Complete lines 2a through 2e if you gave less than an entire interest in a property listed in Part I. Complete lines 3a through 3c if conditions were placed on a contribution listed in Part I; also attach the required statement (see instructions). |
|---|---|

**2a** Enter the letter from Part I that identifies the property for which you gave less than an entire interest ▶ _____
If Part II applies to more than one property, attach a separate statement.

**b** Total amount claimed as a deduction for the property listed in Part I: (1) For this tax year ▶ _____
(2) For any prior tax years ▶ _____

**c** Name and address of each organization to which any such contribution was made in a prior year (complete only if different from the donee organization above):

Name of charitable organization (donee)

_____

Address (number, street, and room or suite no.)

_____

City or town, state, and ZIP code

_____

**d** For tangible property, enter the place where the property is located or kept ▶ _____

**e** Name of any person, other than the donee organization, having actual possession of the property ▶ _____

| | | Yes | No |
|---|---|---|---|
| **3a** | Is there a restriction, either temporary or permanent, on the donee's right to use or dispose of the donated property? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **b** | Did you give to anyone (other than the donee organization or another organization participating with the donee organization in cooperative fundraising) the right to the income from the donated property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire? . . . . . . . . . | | |
| **c** | Is there a restriction limiting the donated property for a particular use? . . . . . . . . . | | |

| For Paperwork Reduction Act Notice, see separate instructions. | Cat. No. 62299J | Form **8283** (Rev. 12-2006) |
|---|---|---|



February 19, 2025

TO WHOM IT MAY CONCERN

This Kolstein Testore Model Bass with bow were gifted to the International Society of Bassists (ISB) by Barry Kolstein of Wantagh, New York. The International Society of Bassists is a 501(c)(3) organization, Federal EIN 31-1616145 founded in 1967.

The ISB is making this bass available to the Jerusalem Academy of Music & Dance on indefinite loan while retaining ownership of the instrument.

Sincerely,

*Madeleine Crouch*

Madeleine Crouch, ISB General Manager

14070 Proton Rd. Suite 100 ଔ Dallas, Texas 75244 ଔ (972) 233-9107 ଔ ext. 204  info@ISBworldoffice.com